# STATE OF CONNECTICUT *v.* KENNETH CARTER
## (AC 32783)

Alvord, Sheldon and West, Js.

Argued September 20, 2012—officially released March 19, 2013

*Richard E. Condon, Jr.*, senior assistant public defender, for the appellant (defendant).

*Rita M. Shair*, senior assistant state's attorney, with whom were *Michael L. Regan*, state's attorney, and, on the brief, *Michael E. Kennedy*, senior assistant state's attorney, for the appellee (state).

*Opinion*

SHELDON, J. The defendant, Kenneth Carter, appeals from the judgment of conviction, rendered against him following a jury trial in the New London Superior Court, on charges of attempt to commit assault in the first degree with a deadly weapon in violation of General Statutes §§ 53a-49 (a) (2) and 53a-59 (a) (1), reckless

endangerment in the first degree in violation of General Statutes § 53a-63 and threatening in the second degree in violation of General Statutes § 53a-62 (a) (2).[1] On appeal, the defendant claims that insufficient evidence was adduced at trial to sustain his conviction of any of those charges. We affirm the judgment of the trial court.

The jury was presented with the following evidence upon which to base its verdict. At approximately 10:30 p.m. on October 29, 2008, as Officer Brigitte Nordstrom of the Groton town police department was participating in the execution of a search warrant, she received a text message from one of her confidential informants, Jeffrey Mumford. Mumford advised her that the defendant, whom she had known for many years, was going to "pop this white dude" at the Time Out Sports Café in Groton (café). When Nordstrom replied to Mumford that if she responded to his tip he might be exposed as a confidential informant, he texted back, "I don't care, keep me safe." Nordstrom then called Mumford on his cellular telephone to learn what the defendant was wearing and where he could be found inside the café.

Nordstrom next informed her supervisor, Lieutenant James Bee, of the reported situation at the café and he, in turn, informed his shift commander, Lieutenant Ben Carpenter, who arranged at once for certain uniformed officers to meet with Nordstrom and Bee in the parking lot of a firehouse not far from the café. It was decided at that meeting that the entire team would proceed to

---

[1] The defendant was also convicted of criminal possession of a pistol or revolver in violation of General Statutes § 53a-217c (a) (1); carrying a pistol or revolver without a permit in violation of General Statutes § 29-35 (a); possession of narcotics in violation of General Statutes § 21a-279 (a); possession of a controlled substance in violation of General Statutes § 21a-279 (c); and violation of a protective order in violation of General Statutes § 53a-223 (a). The defendant makes no claim on appeal with respect to his conviction of those charges.

the café, that Nordstrom and Bee would enter first to spot and make contact with the defendant, and that the other officers, Sergeant Keith Ashbey and Officers William Wolfe and Richard Savino, would enter immediately thereafter to provide uniformed presence and backup, surveying the crowd for confederates of the defendant or other possible sources of danger. Nordstrom and Bee were both dressed in plainclothes, but were wearing blue shirts with the words "police" and "narcotics task force" emblazoned in bright yellow letters on the front and back, respectively. The other officers were all wearing their regular police uniforms.

After arriving at the café, the team entered as planned, with Nordstrom, Bee and Ashbey leading the way, followed by Wolfe and Savino several steps behind. As they entered, Nordstrom, who was carrying her unholstered service pistol to her side, and Bee, who was unarmed, quickly spotted the defendant standing at the bar to their immediate left, in the company of two women. When the officers first saw him, the defendant was leaning against the bar with the left side of his body. As Nordstrom and Bee turned to move in his direction, however, he immediately turned to face them while pulling a small handgun from his right front pants pocket. He raised the gun and pointed it at Nordstrom's midsection. Upon seeing the defendant pull his gun, Nordstrom loudly shouted, "gun," then, "he's got a gun," to warn her fellow officers, while raising her own gun to point it at him. Bee, who saw the defendant holding something that could have been a gun, also shouted, "gun," to alert his fellow officers as Nordstrom ordered the defendant to drop his gun, which he did not do. Instead, the defendant and Nordstrom had a brief standoff, with their guns pointed at each other but neither attempting to shoot, until the defendant turned away toward the bar, with his gun and both of his hands in front of him and his back to Nordstrom and Bee.

Ashbey, who upon entering the café had moved past and to the right of Bee and Nordstrom to take up a position to the right and rear of the bar, from where he could survey the crowd of from twenty-five to fifty patrons,[2] refocused his attention on the defendant when he heard his fellow officers' warnings about the defendant's gun. Ashbey, however, never saw the defendant holding a gun, for by the time he turned toward the defendant, Wolfe and Savino, who had followed him into the café, were struggling with the defendant near the bar in an effort to secure his arms from behind. When the defendant continued to struggle with Wolfe and Savino, even after the three of them fell to the floor, Ashbey, who was carrying his .22 caliber patrol rifle, ordered Wolfe and Savino to back away from the defendant, then ordered the defendant to show his hands or be shot. Upon making eye contact with Ashbey and seeing the patrol rifle aimed at his back, the defendant finally stopped struggling and submitted to being handcuffed.

Wolfe and Savino also testified that they never saw the defendant holding a gun. According to Wolfe, by the time he entered the café, Nordstrom and Bee were already struggling with the defendant. Savino explained that his attention, which was initially focused on the crowd, was not drawn to the defendant until he heard his fellow officers' shouted warnings, whereafter he turned and saw them struggling with the defendant. Wolfe and Savino both confirmed Ashbey's account of their unsuccessful efforts to secure the defendant's hands both before and after they brought him to the floor, and of the defendant's eventual submission to handcuffing once they moved away from him and Ashbey threatened to shoot him. Wolfe further testified that after the defendant was subdued, a search of his

[2] Based upon the testimony of the officers at trial, there were twenty-five to fifty patrons at the café.

clothing revealed a small silver handgun in his right front pants pocket and a cigarette box containing suspected drugs in his left front pants pocket. The handgun was a .22 caliber Jennings semiautomatic pistol with five rounds in the magazine but none in the chamber. The contents of the cigarette box were later determined, by testing at the state forensic laboratory, to be marijuana and crack cocaine.

Upon leaving the café, the defendant, who had once played youth basketball on a team that Nordstrom coached, told her that he would never pull a gun on her. In his testimony, although he denied pulling a gun on Nordstrom, the defendant confirmed that as he left the café he said to her, "Brigitte, I would never pull a gun out on you." Thereafter, Savino transported the defendant to the police station for processing.

At the station, Savino waited with the defendant outside of the booking room. Seated and handcuffed, the defendant studied Savino's face and asked him where he lived. Savino ignored the question. The defendant then asked Savino where his mother lived and said that he would molest her and enjoy the process. The defendant, while staring at Savino's face, then stated that he would hold a grudge against him: "No matter how long I'm in jail for, no matter how rich I ever got, I still remember your face, and I'd still hold my grudge." Finally, the defendant asked Savino, "[w]hat if I see you tomorrow outside of work leaning outside of my job?" When Savino responded, "[w]hat if?" the defendant stated, "I'd kick your ass."

Savino believed that the defendant's statements were genuine threats to himself and his family. He testified that although he had been insulted on the job before, he took the defendant's statements seriously because they concerned his family. Savino testified that he felt

threatened because he believed that his address could be found on the Internet.

The state also presented testimony from James Stephenson, a state firearms tool mark examiner. Stephenson testified that, based upon his examination of the defendant's gun, it was an operable, .22 caliber Jennings semiautomatic handgun with a magazine containing five bullets. There was no bullet in the chamber. Stephenson testified that to prepare the gun for firing, a would-be shooter would have to pull back the slide and release it, causing a cartridge to be transferred from the magazine in the handle of the gun to the chamber. Although this action, known as "racking the gun," could be performed in a matter of seconds, it required deliberate action. If the gun was not racked, and thus had no bullet in the chamber, it could not be fired.

Following a jury trial, the defendant was convicted on all eight counts of the substitute information, including those charging him with attempted assault in the first degree, reckless endangerment in the first degree and threatening in the second degree.[3] He was sentenced on all charges to a total effective term of twenty years imprisonment, execution suspended after fourteen years, and five years of probation.[4] This appeal followed. Additional facts will be set forth as necessary.

I

The defendant first claims that insufficient evidence was presented at trial to sustain his conviction of

[3] See footnote 1 of this opinion.

[4] On count one of attempted assault in the first degree, the court imposed a sentence of twenty years imprisonment, execution suspended after fourteen years, followed by five years of probation, constituting the total effective sentence. On the counts of reckless endangerment in the first degree, possession of marijuana and threatening in the second degree, the court imposed concurrent terms of one year imprisonment. On the counts of criminal possession of a pistol, carrying a pistol without a permit, possession of crack cocaine and criminal violation of a protective order, the court imposed concurrent terms of five years imprisonment.

attempted assault in the first degree. Specifically, he argues that the evidence was insufficient to prove the mental state required for the commission of that offense, to wit: that at the time of his challenged conduct, he had the intent to cause serious physical injury to another person. On that score, the defendant argues that the alleged conduct upon which the state bases its claim of attempt against him—the pointing of an operable semiautomatic pistol at Nordstrom, with no bullet in the chamber and no effort by him to put one in there by racking the pistol—is simply too equivocal to support a finding, beyond a reasonable doubt, that he engaged in such conduct with the intent to shoot the officer, and thus to cause her serious physical injury. On the facts of this case, we disagree.

We begin by setting forth our standard of review. "[T]he [d]ue [p]rocess [c]lause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged. . . . The standard of review for a sufficiency of the evidence claim employs a two part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [jury] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. . . . This court cannot substitute its own judgment for that of the jury if there is sufficient evidence to support [its] verdict. . . .

"It is axiomatic that the jury must find every element proven beyond a reasonable doubt in order to find the defendant guilty of the charged offense, [but] each of the basic and inferred facts underlying those conclusions need not be proved beyond a reasonable doubt. . . . If it is reasonable and logical for the jury to conclude that a basic fact or an inferred fact is true, the

jury is permitted to consider the fact proven and may consider it in combination with other proven facts in determining whether the cumulative effect of all the evidence proves the defendant guilty of all the elements of the crime charged beyond a reasonable doubt. . . . On appeal, we do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the [jury's] verdict of guilty." (Citations omitted; internal quotation marks omitted.) *State* v. *Reid*, 123 Conn. App. 383, 391–92, 1 A.3d 1204, cert. denied, 298 Conn. 929, 5 A.3d 490 (2010).

Section 53a-49 (a) provides in relevant part that "[a] person is guilty of an attempt to commit a crime if, acting with the kind of mental state required for commission of the crime, he . . . (2) intentionally does or omits to do anything which, under the circumstances as he believes them to be, is an act or omission constituting a substantial step in a course of conduct planned to culminate in his commission of the crime." Subsection (b) of § 53a-49, in turn, provides in relevant part: "Conduct shall not be held to constitute a substantial step under [§ 53a-49 (a) (2)] unless it is strongly corroborative of the actor's criminal purpose . . . ." To prove an actor guilty of attempt under § 53a-49 (a) (2), the state need not show that his conduct progressed so far as to constitute the final step in a course of conduct planned to culminate in the commission of the crime, had the circumstances been as he believed them to be. Such conduct is separately punishable as an attempt under § 53a-49 (a) (1). Instead, § 53a-49 (a) (2) makes punishable, as an attempt to commit a particular crime, any act or omission performed by the actor with the mental state required for commission of that crime, which is both strongly corroborative of the actor's criminal purpose and at least the start of a line of conduct

that will lead naturally to the commission of the planned crime, by means which, to the actor, at least, commission of the crime appears possible. See *State* v. *Wilcox*, 254 Conn. 441, 468, 758 A.2d 824 (2000).

General Statutes § 53a-59 (a), in turn, provides in relevant part that "[a] person is guilty of assault in the first degree when: (1) With intent to cause serious physical injury to another person, he causes such injury to such person . . . by means of a deadly weapon or a dangerous instrument . . . ." Accordingly, a conviction of attempt to commit assault in the first degree, in violation of §§ 53a-49 (a) (2) and 53a-59 (a) (1), requires proof beyond a reasonable doubt of two elements: (1) that while acting with the intent to cause serious physical injury to another person, (2) the defendant intentionally took a substantial step in a course of conduct planned to cause such injury to the other person by means of a deadly weapon or dangerous instrument.

"A person acts 'intentionally' with respect to a result . . . described by a statute defining an offense when his conscious objective is to cause such result . . . ." General Statutes § 53a-3 (11). The statute thus requires that when the defendant engaged in the conduct claimed to constitute the offense, it was his conscious objective to cause serious physical injury to Nordstrom. It matters not, in most cases, whether the actor harbored his criminal intent for any particular period of time prior to acting on that intent, or that he continued to harbor it for any particular period of time thereafter. What matters instead is that he had the requisite intent at the moment he engaged in the conduct claimed to constitute the crime. See *State* v. *Cooper*, 227 Conn. 417, 444, 630 A.2d 1043 (1993) (formation of specific intent does not require planning or premeditation, but rather, it may be formed instantaneously).

"It is well established that the question of intent is purely a question of fact. . . . The state of mind of one

accused of a crime is often the most significant and, at the same time, the most elusive element of the crime charged. . . . Because it is practically impossible to know what someone is thinking or intending at any given moment, absent an outright declaration of intent, a person's state of mind is usually proven by circumstantial evidence . . . . Intent may be and usually is inferred from conduct . . . . [W]hether such an inference should be drawn is properly a question for the jury to decide." (Citations omitted; internal quotation marks omitted.) *State* v. *Torwich*, 38 Conn. App. 306, 314, 661 A.2d 113, cert. denied, 235 Conn. 905, 665 A.2d 906 (1995). "[I]ntent may be inferred from the events leading up to, and immediately following, the conduct in question . . . the accused's physical acts and the general surrounding circumstances." (Internal quotation marks omitted.) *State* v. *Ayala*, 133 Conn. App. 514, 520, 36 A.3d 274, cert. denied, 304 Conn. 913, 40 A.3d 318 (2012).

Here, the conduct by which the defendant was alleged to have taken a substantial step in a course of conduct planned to culminate in his commission of assault in the first degree, and thus to have committed attempted assault in the first degree, was the drawing of his handgun and the pointing of it at Nordstrom's midsection. That, then, is the conduct that the defendant must be shown to have been engaged in with the intent to cause serious physical injury to another person. Although the defendant never fired a shot at Nordstrom after engaging in such conduct, nor even racked his gun to make it ready for firing before he turned away toward the bar in what proved to be a successful attempt to return the gun to his right front pants pocket, the question presented to the jury was not with what intent he ended his brief standoff with Nordstrom, but with what intent he began it. The issue on appeal is thus whether the evidence supports a finding that, in the initial part of

this incident—when he first drew his gun and pointed it at Nordstrom—the defendant had the intent, for however short a time, to cause serious physical injury to her.

Examining the defendant's conduct in the surrounding circumstances, viewed in the light most favorable to the state, the evidence supports the following reasonable conclusions. Before Nordstrom and her colleagues appeared at the door of the café, the defendant was in illegal possession of a loaded, operable handgun and a container of illegal drugs. As a person previously convicted of both assault in the third degree and possession of marijuana, it was unlawful for him to possess a firearm of any kind. Moreover, as the subject of a domestic violence protective order, he had been ordered to surrender all firearms in his possession to the authorities pursuant to General Statutes § 46b-38c (e).[5] Had the defendant been mindful of these facts, he would most certainly not have been eager to show his gun to a police officer, much less to pull his gun and point it at someone he knew to be a police officer.

On the other hand, the defendant had told at least one other person, Mumford, Nordstrom's confidential informant, that he intended to "pop this white dude" in or around the café that evening. For that purpose, he was armed with a loaded, operable handgun that he had conveniently placed in his right front pants pocket, where he could easily access it and put it to its intended use. By reasonable implication, he believed that the gun was ready for that use, which would only require him to pull back the slide in order to rack it and prepare it for firing. On this evidence, the defendant could reasonably be found to have planned and prepared himself to

---

[5] General Statutes § 46b-38c (e) provides in relevant part: "A protective order issued under this section may include provisions necessary to protect the victim from threats, harassment, injury or intimidation by the defendant . . . ."

use the gun to shoot someone at the time the officers entered the café.

When Nordstrom and Bee first came through the front door of the café, the defendant was standing by the bar to their immediate left. Although, at that moment, the officers were wearing blue shirts with the word "police" emblazoned on the front in bright yellow letters, they were then facing forward in such a way that the defendant, who reached immediately for his gun as he began to turn toward them, may only have seen Nordstrom's unholstered gun, not her familiar face or the word police on her and Bee's blue shirts. The jury thus reasonably could have concluded that the defendant pulled out his gun and aimed it at the officers before he realized that they were police, much less police with whom he was acquainted. Perhaps he believed that one of them was the "white dude" for whom he had been lying in wait. Perhaps he believed that they were friends of the white dude who had come to the café to attack him before he attacked their friend. In any event, the jury could reasonably have concluded that he drew his gun and pointed it at Nordstrom, whom he then perceived to be an unknown armed intruder rather than a known police officer, with the intent to shoot her and cause her serious physical injury because she surprised and endangered him as he lay in wait for his intended victim. Such conduct could reasonably be found to have been not only the start of a line of conduct leading naturally to shooting Nordstrom and causing her serious physical injury, but to have been strongly corroborative of his alleged purpose to engage in such conduct and cause such results, thus constituting an attempt to commit assault in the first degree against Nordstrom.

The foregoing explanation of the defendant's conduct is also supported by other evidence adduced at trial. To begin with, by the time Nordstrom and Bee turned to their left to face the defendant, revealing the word

"police" on their shirts and enabling the defendant to get a good look at Nordstrom's face, he had already drawn, raised and pointed his gun in her direction. His prompt realization that Nordstrom and Bee were police officers rather than unknown armed intruders was quickly confirmed by their warning shouts to their fellow officers about his gun, by Nordstrom's demand to him that he drop his gun and by the appearance of other armed, uniformed officers behind them. By that time, it would appear, upon realizing with whom he was dealing, the defendant had abandoned his threshold plan to shoot one or more of the officers. Thus, within moments after learning the officers' true identity, after briefly holding his gun in the position to which he had initially raised it, albeit without attempting to rack or fire it, he turned away toward the bar in an effort to conceal the gun in his pocket, where it was later found by Officer Wolfe. This explanation of the defendant's conduct, moreover, is consistent with his statement to Officer Nordstrom as he was being taken away to be booked. By stating to Nordstrom, whom he knew by first name, "Brigitte, I would never pull a gun out on you," he could reasonably be found to have been saying not that he had not pulled a gun on her, but rather that he would not have pulled the gun on her had he known who she was when he pulled it.

Although the defendant may never have intended to shoot and cause serious physical injury to a police officer on the evening in question, his threshold intent, to shoot and injure Nordstrom when, by inference, he thought that she was someone else was sufficient to establish the mental state required for commission of attempted assault in the first degree, regardless of how quickly his intent was abandoned. See *State* v. *Wilcox*, supra, 254 Conn. 468 (crime complete when act done with requisite intent).

The defendant's prompt abandonment of his original purpose to shoot and injure Nordstrom in the wake of his dawning realization as to who in fact she was did not deprive his initial conduct, engaged in with that purpose, of its criminal character. This argument finds support in our law of attempt, which requires only that the defendant be shown to have had the intent to cause serious physical injury to another at the time he intentionally took a substantial step in a course of conduct planned to culminate in his commission of assault in the first degree. General Statutes § 53a-49 (a) (2). It is irrelevant if the defendant later changed his mind because, by that time, the crime was already completed. See *State* v. *Jones*, 96 Conn. App. 634, 641, 902 A.2d 17 ("[t]he attempt is complete and punishable, when an act is done with intent to commit the crime, which is adapted to the perpetration of it, whether the purpose fails by reason of interruption . . . or for other extrinsic cause" [internal quotation marks omitted]), cert. denied, 280 Conn. 919, 908 A.2d 544 (2006). It is true, of course, that our law provides a valid defense to the crime of attempt if, after engaging in conduct that would otherwise have constituted an attempt, a defendant voluntarily renounces his criminal purpose in such a way as to prevent the completion of his once-planned crime. Under General Statutes § 53a-50, however, such a defense is available to a defendant only when his abandonment of criminal purpose is not "motivated, in whole or in part, by circumstances, not present or apparent at the inception of the actor's course of conduct, which increase the probability of detection or apprehension or which make more difficult the accomplishment of the criminal purpose. . . ." That disqualification from claiming the defense of renunciation is plainly applicable here.[6] Given the facts adduced at trial,

---

[6] The jury was not instructed under § 53a-50 because the defendant never sought to defend this case on the ground of renunciation. Instead, he denied that he ever had the criminal purpose of inflicting serious physical injury

therefore, it was entirely reasonable and logical for the jury to conclude that when the defendant first pointed his gun at Nordstrom, he intended to inflict serious physical injury upon her. His decision to desist from that plan once her true identity—as an armed police officer in the company of several other armed police officers—became known to him, could not have constituted a defense to the crime of attempt because it was motivated, in whole or in part, by circumstances not apparent at the inception of his course of conduct, which both increased the probability of his detection and made the accomplishment of his criminal purpose more difficult.

In conclusion, we find that the evidence presented at trial was sufficient to sustain the mental state element of attempted assault in the first degree.

## II

The defendant next claims that insufficient evidence was adduced at trial to sustain his conviction of reckless endangerment in the first degree in violation of § 53a-63 (a). The defendant contends that reversal of his conviction of that offense is required because the state failed to establish that he engaged in conduct that evinced an extreme indifference to human life or created a substantial and unjustifiable risk of serious physical injury to another person. We disagree.

As noted in part I of this opinion, we employ a two part test in evaluating claims of insufficient evidence: "First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [jury] reasonably could

upon Nordstrom by means of a deadly weapon. Hence, by his testimony, he had no criminal purpose to renounce.

have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt." (Internal quotation marks omitted.) *State* v. *Reid*, supra, 123 Conn. App. 391.

Section 53a-63 (a) provides: "A person is guilty of reckless endangerment in the first degree when, with extreme indifference to human life, he recklessly engages in conduct which creates a risk of serious physical injury to another person." According to General Statutes § 53a-3 (13), "[a] person acts 'recklessly' with respect to a result or to a circumstance described by a statute defining an offense when he is aware of and consciously disregards a substantial and unjustifiable risk that such result will occur or that such circumstance exists. The risk must be of such nature and degree that disregarding it constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation . . . ." In determining whether a defendant has acted recklessly for purposes of § 53a-63 (a), "[s]ubjective realization of a risk may be inferred from [the defendant's] words and conduct when viewed in the light of the surrounding circumstances." (Internal quotation marks omitted.) *State* v. *Davila*, 75 Conn. App. 432, 439, 816 A.2d 673, cert. denied, 264 Conn. 909, 826 A.2d 180 (2003), cert. denied, 543 U.S. 897, 125 S. Ct. 92, 160 L. Ed. 2d 166 (2004). The dispositive issue, therefore, is whether the defendant, when he pointed a firearm at police officers in a crowded bar and subsequently struggled with officers while they were attempting to subdue him, recklessly created and consciously disregarded a substantial and unjustifiable risk of serious physical injury to another person.

On appeal, the defendant claims that the state, in arguing its case to the jury, limited the basis for its claim of reckless endangerment to his conduct of later struggling with police while holding a loaded gun after

pointing it at Nordstrom. The defendant argues that his conviction on this charge must be reversed because his gun, which was not racked at any time during this incident, could not have fired a shot, and thus he did not and could not have consciously disregarded any risk, much less a substantial and unjustifiable risk, that the gun would discharge, thereby causing serious physical injury to another person.

In its closing arguments, however, the state presented a much broader theory of reckless endangerment than that suggested by the defendant. The state claimed, more particularly, that by pointing his gun at Nordstrom in the crowded café, then struggling with Wolfe and Savino as they attempted to disarm him and take him into custody until Ashbey threatened to shoot him, he created an extremely dangerous situation in which an officer or patron could have been shot and seriously injured if the officers' or a third party's foreseeable intervention resulted in gunfire.[7]

---

[7] On this score, the prosecutor argued: "The officers testified that there were twenty-five to fifty people in the bar that night. That's twenty-five to [fifty] human lives. We heard testimony from Bee and Nordstrom [that] the defendant drew a loaded weapon and pointed it at Officer Nordstrom. He wouldn't surrender it. He didn't follow Nordstrom's command. He turned to the bar and then he's set up by Officer Savino and Wolfe. He resisted their efforts to make that situation safe. . . . [W]e heard testimony . . . about the destructive power of a .22 caliber bullet. [We heard testimony] from Sergeant Ashbey about how close he came to discharging his rifle at the defendant because the defendant would . . . not comply with the officer's commands. The state would argue that that evidence shows that [the defendant] had [an] indifference or had very extreme indifference to human life and that his conduct was indeed reckless and that . . . with a handgun there is a serious risk of physical injury." In his rebuttal argument, the prosecutor urged the jury to understand that actual harm was avoided by the officers' self-restraint, despite the actual danger created by the defendant's reckless conduct: "[W]ell-trained, experienced officers can do their jobs correctly. . . . [The officers] exercised [restraint]. Remember Brigitte Nordstrom was talking about tightening her finger on the trigger, taking up the slack. . . . Sergeant Ashbey was talking about taking his finger off the trigger guard and putting it on the trigger of his patrol rifle. Why didn't they shoot? Because they're professionals, they're not supposed to. . . . There were no shots fired. No innocent bystanders injured."

While we are without the benefit of guiding precedent on the issue in this state, other states have recognized the viability of the state's theory of reckless endangerment. The state of Pennsylvania, for example, has adopted a reckless endangerment statute similar to that of Connecticut. See 18 Pa. Cons. Stat. Ann. § 2705 (West 2000).[8] Interpreting that statute, which is very similar to the one here at issue, the court in *Commonwealth v. Holguin*, 254 Pa. Super. 295, 307–308, 385 A.2d 1346 (1978), held that the pointing of an unloaded pistol at people in a crowded bar created an actual danger of serious physical injury because a significant risk was thereby created that someone inside the bar, such as the proprietor, the bartender or a patron, would respond to the defendant's conduct with gunfire, thus endangering other people in the bar. The court in *Holguin* also noted the special risk created by the pointing of a gun at an armed police officer. Even if the gun so pointed is later found to have been unloaded, such conduct gives rise to the substantial risk that "the police officer might shoot at the defendant and hit either his target or an innocent passerby." Id., 307. Other jurisdictions with reckless endangerment statutes similar to our own have acknowledged the dangerous situation that may arise from the pointing of a firearm at another person. *Al-Saud v. State*, 658 N.E.2d 907, 910 (Ind. 1995) ("[t]he

---

The defendant also claims that the state limited its theory of guilt to the subsequent struggle with officers when it argued, during sentencing, that the attempted assault and reckless endangerment counts should not be merged. This argument also fails. During sentencing, the defendant requested that the lesser included offense of reckless endangerment be merged with the attempted assault count, arguing that they consisted of the same elements. The state contended, and the court agreed, that while the reckless endangerment count included the allegation that the defendant pointed the gun at Nordstrom, it also included the allegation that the defendant struggled with officers while carrying a loaded firearm in a crowded bar.

[8] Title 18 of Pennsylvania Consolidated Statutes Annotated, § 2705, provides: "A person commits a misdemeanor of the second degree if he recklessly engages in conduct which places or may place another person in danger of death or serious bodily injury."

brandishing of a firearm in a congested area or during a dispute can create a variety of risks of bodily injury to others, regardless of whether the weapon is loaded"); *Thomas* v. *Commonwealth*, 567 S.W.2d 299, 300–301 (Ky. 1978) (forcing victim to drive car at gunpoint and subsequently pointing unloaded gun at police officer constituted reckless endangerment because such conduct could have caused victim, police officer or others to engage in actions that would create substantial danger of death, serious physical injury or physical injury); *In re ALJ*, 836 P.2d 307, 310 (Wyo. 1992) ("[t]he unknown and frequently violent reactions of persons having guns pointed at them, unloaded or not, create an obvious danger"). We find the reasoning and conclusions of these courts both logical and applicable to the present case.

Here, even though the defendant's gun was not racked, sufficient evidence was presented at trial for the jury to conclude that the defendant—by engaging in his challenged conduct—acted with extreme indifference to human life, and consciously disregarded a substantial and unjustifiable risk that such conduct would cause serious physical injury to another person. Pointing a firearm at a police officer creates a substantial risk that an armed response to the defendant's conduct will result in gunfire and, thus, in serious injury to officers or bystanders. See *State* v. *Davila*, supra, 75 Conn. App. 439 (subjective realization of risk may be inferred from person's conduct when viewed in light of surrounding circumstances). The defendant is no less culpable because his own gun could not have fired a shot; the danger engendered by his conduct arose from the distinct potential that others in the crowded bar would fire their weapons at him. Such conduct thus created a dangerous environment in which, as the prosecutor argued to the defendant's jury, disaster was averted only due to the professionalism and restraint

of the officers. Considering the conduct at issue, our inquiry under § 53a-63 (a) focuses on the creation of an objective risk of serious physical injury, rather than the creation of the injury itself.[9] We conclude that there was sufficient evidence in the record to support the jury's guilty verdict on the charge of reckless endangerment in the first degree.

## III

The defendant's final claim on appeal is that there was insufficient evidence to establish that his statements to Savino constituted constitutionally impermissible speech, as required for conviction under § 53a-62 (a) (2). In determining whether the defendant's speech may be regulated by the state, we look to whether it falls within the broad protections of the first amendment to the United States constitution, or whether it can be characterized as an unprotected "true threat"—speech that would cause a reasonable person to foresee that the person to whom the speech was directed will believe that he will be subjected to physical violence. *State* v. *DeLoreto*, 265 Conn. 145, 156, 827 A.2d 671 (2003).

We begin our inquiry by setting forth the standard of review, which seeks to strike a balance between the interests of protecting the freedom of speech and regulating statements that are devoid of any communicative value, such as true threats. "The standard of review we [ordinarily] apply to a claim of insufficient evidence is well established. In reviewing the sufficiency of the evidence to support a criminal conviction we apply a two-part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second,

[9] Our holding is also consistent with our own legislative history. See Commission to Revise the Criminal Statutes, Penal Code Comments, Conn. Gen. Stat. Ann. § 53a-63 (West 1971), commission comment ("[section] 53a-63 . . . cover[s] dangerous conduct which falls short of assault because . . . of a lack of actual injury taking place").

we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [finder of fact] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. . . . In [*DeLoreto*], however, [our Supreme Court] explained that [t]his [c]ourt's duty is not limited to the elaboration of constitutional principles; we must also in proper cases review the evidence to make certain that those principles have been constitutionally applied. This is such a case, particularly since the question is one of alleged trespass across the line between speech unconditionally guaranteed and speech which may legitimately be regulated. . . . In cases [in which] that line must be drawn, the rule is that we examine for ourselves the statements in issue and the circumstances under which they were made to see . . . whether they are of a character which the principles of the [f]irst [a]mendment . . . protect. . . . We must [independently examine] the whole record . . . so as to assure ourselves that the judgment does not constitute a forbidden intrusion on the field of free expression. . . . [Our Supreme Court] . . . reiterated this de novo scope of review in free speech claims in *DiMartino* v. *Richens*, 263 Conn. 639, 661–62, 822 A.2d 205 (2003) . . . . Although credibility determinations are reviewed under the clearly-erroneous standard because the trier of fact has had the opportunity to observe the demeanor of the witnesses . . . the reviewing court must examine for [itself] the statements in issue and the circumstances under which they were made to determine if they are protected by the first amendment." (Citations omitted; internal quotation marks omitted.) *State* v. *Krijger*, 130 Conn. App. 470, 477–78, 24 A.3d 42, cert. granted on other grounds, 302 Conn. 935, 28 A.3d 992 (2011).

"The First Amendment, applicable to the States through the Fourteenth Amendment, provides that Congress shall make no law . . . abridging the freedom of

speech. The hallmark of the protection of free speech is to allow free trade in ideas—even ideas that the overwhelming majority of people might find distasteful or discomforting. . . . Thus, the First Amendment ordinarily denies a State the power to prohibit dissemination of social, economic and political doctrine which a vast majority of its citizens believes to be false and fraught with evil consequence. . . . The First Amendment affords protection to symbolic or expressive conduct as well as to actual speech. . . .

"The protections afforded by the First Amendment, however, are not absolute, and we have long recognized that the government may regulate certain categories of expression consistent with the Constitution. . . . The First Amendment permits restrictions upon the content of speech in a few limited areas, which are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality." (Internal quotation marks omitted.) *State* v. *DeLoreto*, supra, 265 Conn. 153–54.

"[T]rue threats are among the limited areas of speech which properly may be restricted without violating the protections of the first amendment." (Internal quotation marks omitted.) *State* v. *Krijger*, supra, 130 Conn. App. 479. "True threats encompass those statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals. . . . The speaker need not actually intend to carry out the threat. Rather, a prohibition on true threats protect[s] individuals from the fear of violence and from the disruption that fear engenders, in addition to protecting people from the possibility that the threatened violence will occur. . . .

"[A]s expansive as the first amendment's conception of social and political discourse may be, threats made

with specific intent to injure and focused on a particular individual easily fall into that category of speech deserving no first amendment protection. . . . Thus, we must distinguish between true threats, which, because of their lack of communicative value, are not protected by the first amendment, and those statements that seek to communicate a belief or idea, such as political hyperbole or a mere joke, which are protected. . . .

"In the context of a threat of physical violence, [w]hether a particular statement may properly be considered to be a threat is governed by an objective standard—whether a reasonable person would foresee that the statement would be interpreted by those to whom the maker communicates the statement as a serious expression of intent to harm or assault. . . . A true threat, where a reasonable person would foresee that the listener will believe he will be subjected to physical violence upon his person, is unprotected by the first amendment. . . . Moreover, [a]lleged threats should be considered in light of their entire factual context, including the surrounding events and reaction of the listeners." (Citations omitted; internal quotation marks omitted.) *State* v. *DeLoreto*, supra, 265 Conn. 154–56.

In resolving the defendant's final claim, we must therefore determine "whether a reasonable person would foresee that the [defendant's] statement would be interpreted by [Savino] as a serious expression of intent to harm or assault." Id., 156. The state claims that several of the defendant's statements to Savino constituted true threats. They included that he "wanted to molest [Savino's] mother"; "I would fuck her; she'd be a good fuck"; "No matter how long I'm in jail for, no matter how rich I ever got, I still remember your face, and I'd still hold my grudge"; and, "I'll kick your ass [if I see you at my place of work tomorrow]." A reasonable person would foresee that Savino would

interpret such words to mean that the defendant was going to assault him and/or his family.

The defendant contends that his statements cannot be considered true threats because they were conditional in nature and, as such, merely repugnant acts of puffery. We do not agree that the defendant's particular verbalization saves his statements from the purview of § 53a-62 (a) (2). "Imminence . . . is not a requirement under the true threats doctrine. . . . Rather, a prohibition on true threats protect[s] individuals from fear of violence and from the disruption that fear engenders, in addition to protecting people from the possibility that the threatened violence will occur." (Citation omitted; internal quotation marks omitted.) *State* v. *DeLoreto*, supra, 265 Conn. 158–59. The prospective nature of the defendant's statements, therefore, does not affect our analysis. Because a reasonable person would foresee that Savino would interpret the statements as a serious expression of an intention to harm or assault, the state may regulate such statements under § 53a-62 (a) (2).

Considering the defendant's statements to Savino "in light of their entire factual context"; (internal quotation marks omitted) id., 156; we find that they constituted true threats. After the officers handcuffed the defendant, Savino transported him to the police station. At the station, Savino waited with the defendant outside of a booking room until the defendant could be processed. The defendant began to stare at Savino and study his face. In addition to threatening Savino and his mother, the defendant also asked Savino where he and his mother lived. The defendant's calm demeanor suggested that his statements were serious and his careful scrutiny of Savino's face intimated that he was attempting to remember it. Under these circumstances, a reasonable person would foresee that the statements would be interpreted by Savino as a serious expression of the defendant's intent to harm or assault him and/

or his mother. We thus conclude that the evidence was sufficient for the jury to find that the defendant's statements constituted true threats in violation of § 53a-62 (a) (2).

The judgment is affirmed.

In this opinion the other judges concurred.