******************************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# STATE OF CONNECTICUT *v.* TARIQ M. ABDULAZIZ
## (AC 45916)

Seeley, Westbrook and Sheldon, Js.

*Syllabus*

Convicted, after a trial to the court, of the crime of health insurance fraud as a result of billing requests he submitted to the Department of Social Services for face-to-face counseling sessions he claimed to have had with clients on 114 separate occasions in their homes in Connecticut while he was in Texas, the defendant appealed. In sentencing the defendant, the court determined that the value of the funds he wrongfully obtained had some value that could not be satisfactorily ascertained and thus set that value at $50 or less pursuant to statute (§ 53a-121 (a) (3)). The court further determined that the defendant's conviction thus constituted a crime of the same grade or degree as larceny in the sixth degree, a class C misdemeanor, and imposed a suspended term of three months of incarceration and eighteen months of probation with special conditions. The court thereafter granted in part the state's motion to correct an illegal sentence and reduced the defendant's probationary term to one year, the maximum period of probation for a conviction of a class C misdemeanor pursuant to statute (§ 53a-29 (d) (4)). The defendant claimed, inter alia, that his rights to due process were violated because the court was required to acquit him on the health insurance fraud charge after having found him not guilty of larceny in the first degree by defrauding a public community in violation of statute ((Rev. to 2017) § 53a-122 (a) (4)). *Held*:

The trial court did not violate the constitutional prohibition against double jeopardy when it corrected the defendant's sentence and resentenced him to a lesser term of probation.

Although the trial court found that the state had failed to prove that the value of the funds the defendant wrongfully obtained exceeded the $2000 necessary to convict him on the larceny charge, the court did not, as the defendant claimed, reverse its decision on the value element of that charge in ruling on the motion to correct an illegal sentence but, rather, reiterated its finding that the value of the funds could not be satisfactorily ascertained and therefore set that value at $50 or less pursuant to § 53a-121 (a) (3).

The defendant's claim that the trial court was required to find him not guilty on the health insurance fraud charge because it had found him not guilty on the larceny charge was unavailing, as the court did not find, as the defendant contended, that no value for the wrongfully obtained property had been proven under the larceny charge but, rather, expressly found that some value had been proven.

The evidence was sufficient to sustain the defendant's conviction of health insurance fraud, as the cumulative effect of all the evidence supported the trial court's conclusions that the defendant had submitted bills to and received payments from the department for face-to-face counseling services that he could not have provided while he was in Texas and that the proven value of the unearned portion of those payments was properly determined to have a value of $50 or less.

Argued September 6, 2024—officially released April 8, 2025

*Procedural History*

Substitute information charging the defendant with the crimes of larceny in the first degree by defrauding a public community, health insurance fraud and failure to appear in the first degree, brought to the Superior Court in the judicial district of Hartford, geographical area number fourteen, where the charges of larceny in the first degree and health insurance fraud were tried to the court, *D'Addabbo, J.*; thereafter, the court granted in part the defendant's motion for a judgment of acquittal; judgment of guilty of health insurance fraud; subsequently, the state entered a nolle prosequi as to the charge of failure to appear in the first degree, and the defendant appealed to this court; thereafter, the court, *Hon. Frank M. D'Addabbo, Jr.*, judge trial referee, granted in part the state's motion to correct an illegal sentence, and the defendant filed an amended appeal. *Affirmed.*

*Alexander T. Taubes*, for the appellant (defendant).

*Danielle Koch*, assistant state's attorney, with whom, on the brief, were *Richard K. Greenalch, Jr.*, senior assistant state's attorney, and *Kyle LaBuff*, assistant state's attorney, for the appellee (state).

*Opinion*

SHELDON, J. The defendant, Tariq M. Abdulaziz, appeals from the judgment of conviction rendered against him following a court trial on the charge of health insurance fraud in violation of General Statutes

§ 53-442 (1)[1] by way of General Statutes § 53-443.[2] The defendant claims that his conviction of health insurance fraud cannot be reconciled with his simultaneous acquittal, based upon the same alleged underlying conduct, of larceny in the first degree by defrauding a public community in violation of General Statutes (Rev. to 2017) § 53a-122 (a) (4).[3] Specifically, he argues that the court had acquitted him of larceny in the first degree based upon the state's failure to prove the "obtaining" and "value" elements of that offense beyond a reasonable doubt and, thus, that it should also have acquitted him of health insurance fraud, which he claims required proof of those same elements to convict him in this case. He further argues that the court later compounded its initial error by reversing his "acquittal on the 'value'

[1] General Statutes § 53-442 provides in relevant part: "A person is guilty of health insurance fraud when he, with the intent to defraud or deceive any insurer, (1) presents or causes to be presented to any insurer or any agent thereof any written or oral statement as part of or in support of an application for any policy of insurance or claim for payment or other benefit from a plan providing health care benefits, whether for himself, a family member or a third party, knowing that such statement contains any false, incomplete, deceptive or misleading information concerning any fact or thing material to such claim or application, or omits information concerning any fact or thing material to such claim or application . . . ."

[2] General Statutes § 53-443 provides: "Any person who violates any provision of sections 53-440 to 53-443, inclusive, shall be subject to the penalties for larceny under sections 53a-122 to 53a-125b, inclusive. Each act shall be considered a separate offense. In addition to any fine or term of imprisonment imposed, including any order of probation, any such person shall make restitution to an aggrieved insurer, including reasonable attorneys' fees and investigation costs."

[3] General Statutes (Rev. to 2017) § 53a-122 provides in relevant part: "(a) A person is guilty of larceny in the first degree when he commits larceny, as defined in section 53a-119, and . . . (4) the property is obtained by defrauding a public community, and the value of such property exceeds two thousand dollars. . . ."

In 2022, the legislature amended § 53a-122 to remove what had previously been subsection (a) (3), which pertained to larceny of a motor vehicle, and renumbered the remaining subsections such that § 53a-122 (a) (4) became § 53a-122 (a) (3). See Public Acts 2022, No. 22-115, § 8.

All references herein to § 53a-122 are to the 2017 revision of that statute unless otherwise indicated.

element of larceny in the first degree when it ruled on the state's [posttrial] motion to correct an illegal sentence." On that basis, he claims on appeal that the court (1) violated the prohibition against successive prosecutions under the fifth and fourteenth amendments to the United States constitution by reversing his acquittal on the value element of the larceny charge, and (2) violated his constitutional right to due process by convicting him of health insurance fraud "without finding every fact necessary to constitute the crime." We reject the defendant's claims and affirm his challenged conviction of health insurance fraud.

The following procedural history and facts, which are either undisputed or reasonably could have been found by the trial court in reaching its guilty verdict, are relevant to our review of the defendant's claims. Medicaid is a "medical insurance program that offers a range of services" to individuals based on their income and asset eligibility. The Department of Social Services (department) administers the Medicaid program in Connecticut. In so doing, the department administers several "Medicaid waiver" programs for qualified department clients, thus allowing the state "to offer a range of services that are not traditionally available under Medicaid . . . ." The department is, in this capacity, an insurer.

The cognitive behavioral program (program), under which home and community based services are offered to adult individuals who have suffered brain injuries, is a Medicaid waiver program that the department administers in accordance with the "Acquired Brain Injury Waiver I" and "Acquired Brain Injury Waiver II" (ABI waivers) requirements.[4] The program's stated

---

[4] The ABI waivers are distinct in that they have "different cost cap[s] . . . ." They establish a similar array of services, however, and they exist concurrently. The program exists under both waivers.

purpose is to provide "a range of nonmedical, home and community-based services to [brain injured] individuals . . . who, without such services, would otherwise require placement in a hospital, nursing facility . . . or Intermediate Care Facility for Individuals with Intellectual Disabilities . . . . The intention of the ABI waiver program is to enable [program participants], through person-centered planning, to receive home and community-based services necessary to allow such individuals to live in the community and avoid institutionalization." Regs., Conn. State Agencies § 17b-260a-1.[5]

"Cognitive-Behavioral Services . . . are individual interventions designed to increase an individual's cognitive and behavioral capabilities and to further the individual's adjustment to successful community engagement." Regs., Conn. State Agencies § 17b-260a-8 (b) (7). These services, which are "performed within the context of the individual's person-centered team, in concert with [a department] social worker who acts as administrative case manager"; ABI Waiver I;[6] include "comprehensive assessment of cognitive strengths and liabilities, quality of adjustment, and behavioral functioning; development and implementation of cognitive behavioral strategies; development of a structured cognitive-behavioral intervention plan; ongoing or periodic consultation with the individual and the person-centered planning team concerning cognitive and behavioral strategies and interventions specified in the cognitive-behavioral plan; ongoing or periodic assistance with training of the individual and person-centered planning team concerning cognitive and behavioral strategies and interventions; and periodic reassessment and revision, as needed, of the cognitive-behavioral intervention plan." Regs., Conn. State Agencies § 17b-260a-8 (b) (7).

---

[5] A copy of §§ 17b-260a-1 to 17b-260a-18, inclusive, of the Regulations of Connecticut State Agencies was introduced into evidence by the state as exhibit 4.

[6] The "ABI Waiver I" was introduced into evidence by the state as exhibit 1.

"Cognitive/behavioral services may be provided in the individual's home or in the community in order to reinforce the training in a real-life situation." ABI Waiver I. An individualized care plan is developed for each program participant, and it is the care plan that identifies what specific services the participant is to receive.

The services "shall be performed by an agency provider or a self-employed provider who is a licensed psychologist, physical therapist, speech therapist, or occupational therapist, a qualified neuropsychologist, or another type of provider authorized to perform cognitive-behavioral services under the ABI waiver program . . . ." Regs., Conn. State Agencies § 17b-260a-8 (b) (7) (A). The ABI waivers delineate the qualifications a provider must have to become a service provider for the program. A qualified provider must prepare and submit an application to the department and be "credentialed" before being allowed to enroll in the program as a service provider.

As part of the enrollment process, a provider must sign the "Provider Enrollment Agreement," which addresses, among other things, "[g]eneral [p]rovider [r]equirements,' "[b]illing/[p]ayment [r]ates," and "[f]raud and [a]buse; [p]enalties." It is "an agreement to abide by [the department's] rules and regulations." The ABI waivers themselves also address and describe the requirements for the delivery of services, including that they "will be delivered utilizing two procedure codes, one for [in-person, face-to-face] visits that include participant, providers and/or supporters. A quarterly, [in-person] meeting with the waiver participant is required [as part of] this service.

"The second procedure code is for non face-to-face service that includes development of the cognitive behavioral plan and phone or other types of interactions with participants, providers or supporters." ABI Waiver I.

By definition, "[f]ace-to-face (in-person) encounters are in-person meetings with the individual, and meetings with the individual's family, supporters,[7] or providers, even when the individual is not present. The provider must have an in-person meeting with the individual at least quarterly. . . .

"Non-face-to-face (not in-person) encounters are telephonic or other secure electronic forms of communication, including video telephony services such as Skype. A provider may also be paid at the non-face-to-face rate for activities such as reviewing the individual's record and writing the plan of care, even if the individual is not present." (Footnote added.) Regs., Conn. State Agencies § 17b-260a-8 (b) (7) (C) (i) and (ii). An example of face-to-face service "would be the . . . provider participating in the team meeting with family members and other supporters and providers and the client," whereas "[n]onface-to-face [service] might be documentation to revise the cognitive behavioral plan that had been developed that the providers would follow." Although program providers are required to meet in person with their clients at least once each quarter of the year, they otherwise have discretion to determine whether to deliver services on a face-to-face or a nonface-to-face basis.

As of September 1, 2016, billings for both face-to-face and nonface-to-face encounters were to be recorded and charged in fifteen minute increments. The rate for a fifteen minute face-to-face encounter was $26.25, whereas the rate for a fifteen minute nonface-to-face encounter was $19.50. A higher rate for face-to-face encounters was offered in order "to encourage

---

[7] The term "supporter" is not separately defined, but Kathy Bruni, who was responsible for overseeing the department's waiver programs, testified at trial that "supporter" is "a standard term used in the provision of home and community based services and, generally, it refers to a family member, an informal supporter . . . or neighbor, someone who is providing in-kind services."

cognitive-behavioral providers to engage their clients in person . . . ."

The defendant is a health care provider and the sole owner of Neurostrategies, Inc., an organization that, at all relevant times, was enrolled in the program as an "Acquired Brain Injury Service Provider." The defendant, who also was "a provider under the ABI waivers"; had prepared, signed and filed with the department a "Provider Enrollment Application" (application) for Neurostrategies, Inc., which listed a "[p]rovider [e]ffective [d]ate" of June 15, 2016, and identified the defendant as the "authorized representative" of Neurostrategies, Inc. The application included, as an addendum, a "Provider Enrollment Agreement," which the defendant signed in his capacity as the authorized representative of Neurostrategies, Inc.

In 2018 and 2019, the defendant submitted to the department[8] 114 claims for payment for face-to-face services he claimed to have provided to thirty different program participants, in their homes,[9] in one or more of the following one week time periods: between June 30 and July 6, 2018; between August 31 and September 7, 2018; between November 16 and 23, 2018; and between December 24, 2018, and January 1, 2019. On the basis

[8] Providers submitted claims for payment through a secure provider web portal. The "main account administrator" for the provider was responsible for managing the provider's web portal and had the authority to designate and authorize "subordinate clerks" to submit claims for payment as well. The defendant was the "main account administrator" who submitted the claims for Neurostrategies, Inc., and there were no "subordinate clerks."

[9] Providers must designate the "place of service" on the health insurance claim forms they submit to the department for payment. The "Claim Submission Instructions" in the department's waiver programs' provider billing manual explain that waiver program providers must "[e]nter the [p]lace of [s]ervice . . . code for *the location where services were performed*." (Emphasis added.) There are only two codes for the ABI waiver providers to use—"12" is for "[h]ome," and "99" is for "[o]ther [p]lace of [s]ervice." Each of the defendant's 114 claims for payment listed "12-[h]ome" for the "[f]acility [t]ype [c]ode [d]escription."

of those submissions, the department paid Neurostrategies, Inc., a total of $13,650 for face-to-face services the defendant claimed to have provided to the department's clients in those four weeks. The defendant, however, was not in Connecticut, but in Dallas, Texas, during each of those weeks and, more specifically, on all dates on which he claimed to have provided in-person, face-to-face services to program participants in their homes in Connecticut.

On June 7, 2022, the state filed a long form information charging the defendant, in the first count, with larceny in the first degree by defrauding a public community in violation of § 53a-122 (a) (4) by way of General Statutes § 53a-119 (6) (A) or (B),[10] and, in the second count, with health insurance fraud in violation of § 53-442 by way of § 53-443. Those charges were based on the defendant's previously described submissions to the department of claims for payment for in-person, face-to-face services he claimed to have provided to program participants, in their Connecticut homes, while he was not in Connecticut, and his allegedly wrongful acceptance of department funds paid to him on the basis of those submissions. Thus, in the first count of the information, on the charge of larceny in the first degree by defrauding a public community, the state alleged more particularly "that on [divers] dates between June 2018 and January 2019, [the defendant], with the intent to defraud a public community, specifically [the department] . . . authorized, certified,

_____

[10] General Statutes § 53a-119 provides in relevant part: "A person commits larceny when, with intent to deprive another of property or to appropriate the same to himself or a third person, he wrongfully takes, obtains or withholds such property from an owner. Larceny includes, but is not limited to . . . (6) Defrauding of public community. A person is guilty of defrauding a public community who (A) authorizes, certifies, attests or files a claim for benefits or reimbursement from a local, state or federal agency which he knows is false; or (B) knowingly accepts the benefits from a claim he knows is false . . . ."

attested or filed multiple claims for benefits or reimbursements from a local, state or federal agency which he knew were false or knowingly accepted the benefits from claims he knew [were] false with the intent to permanently deprive the agency of the value of the claims, and the value of the claims exceed[ed] . . . two thousand dollars ($2,000.00)." In the second count of the information, on the charge of health insurance fraud, the state alleged "that on [divers] dates between June 2018 and January 2019, [the defendant], with the intent to defraud or deceive a state agency, specifically [the department], acting as an insurer, presented or caused to be presented, any written or oral statements as part of or in support of applications for payments, claims or other benefits from a plan providing health care benefits, to wit: Medicaid insurance; that the statements were presented to the insurer or the insurer's agent(s), the defendant knew the statements contained false, incomplete, deceptive or misleading or omitted information material to the claim, whether for himself, a family member or a third party, with intent to defraud."[11]

The defendant waived his right to a jury trial and elected a trial to the court, *D'Addabbo, J.* Trial occurred over the course of eight days in August, 2022. The state presented testimony from ten witnesses, some of whom the defendant cross-examined, and introduced thirty-three exhibits into evidence. The defendant, who represented himself at trial, introduced eleven defense exhibits into evidence before the state rested its case but did not call any witnesses of his own or introduce any additional defense exhibits thereafter.

_____
[11] The long form information also included a third count charging the defendant with failure to appear in the first degree in violation of General Statutes § 53a-172 (a) (1). That count was severed from the information on August 1, 2022, and the state later entered a nolle prosequi on the underlying charge, which was accepted by the court.

The claim forms that the defendant submitted to the department for payment were not introduced into evidence at trial. Instead, the state introduced four spreadsheets, which were made full exhibits, without objection, that listed and described all claims for payment that the defendant had submitted, for both face-to-face and nonface-to-face services he allegedly rendered to the department's program participants between June 30 and July 6, 2018; August 31 and September 7, 2018; November 16 and 23, 2018; and December 24, 2018, and January 1, 2019. Efrem J. Golden,[12] of the Division of Criminal Justice's Medicaid fraud control unit (Medicaid fraud control unit), testified that he had prepared the spreadsheets after Nancy McClure, a police inspector working with the Medicaid fraud control unit, had asked him to "run" the claims for the four weeks in question because those were the weeks for which travel logs prepared as part of the investigation into the billing practices of the defendant and Neurostrategies, Inc., revealed that the defendant was in Texas.[13]

Golden had obtained the billing information from the "Connecticut Data Warehouse," which is a "cloud based system that holds, in electronic format, all the Medicaid health care claims for approximately the last decade or so." He used this information to prepare the four spreadsheets, each of which identified the following information about each service for which payment was requested: the name of the service recipient to whom

---

[12] We note that the court's October 4, 2022 memorandum of decision identifies "Eferin" Golden as one of the witnesses who testified at trial. Our spelling of Golden's first name comports with the spelling used in the list of the "state's witnesses," the court's witness list and the state's brief to this court.

[13] The state also introduced into evidence the defendant's credit card statements and car rental records for the dates in question. Those documents reflect that charges to the defendant's credit card were made in Dallas, Texas, on those dates and that he had rented vehicles in Dallas during those time periods.

the service was allegedly provided; the service recipient's identification number; the specific date on which the service was allegedly provided; the "[f]acility [t]ype [c]ode [d]escription" of the location where the service was allegedly provided; the "procedure description" (face-to-face or nonface-to-face) for the service allegedly provided on the day in question; the amount of time allegedly spent providing the service on that day; the dollar amount requested as payment for providing the service; the identification number and name of the billing provider; and the identification number and name of the performing provider.

For each spreadsheet entry, face-to-face and nonface-to-face alike, the facility type code reads "12-[h]ome"; see footnote 9 of this opinion; the billing and performing provider identification numbers are those assigned to Neurostrategies, Inc., and the billing and performing provider named is Neurostrategies, Inc.[14] As summarized by Golden in his testimony,[15] and later confirmed by McClure,[16] these spreadsheets showed that the

---

[14] The "physician" or "supplier" of services must sign and date each health insurance claim form submitted to the department for payment.

[15] Golden testified that "face-to-face billings were billed while the defendant was in Texas." Further, when asked by the defendant on cross-examination whether it was his "testimony that the defendant is claiming to have been with the client" on those occasions, Golden responded, "[t]hat would be the definition of face-to-face." At the time of trial, Golden had been investigating financial crimes in health care cases for the Division of Criminal Justice for twelve years.

[16] McClure testified that she "gave [Golden] the dates. He runs a comparison based on the evidence that we have from the travel records. We looked at any billings during those time periods to see if there were any billings that could conflict." She also averred in her affidavit in support of the warrant application for the defendant's arrest that she had "compared billing records for [the defendant] and found that he billed for face-to-face . . . services with ABI Waiver clients for the periods of time the subpoenaed records show him to be in Dallas, Texas, [and that he] also billed for [nonface-to-face] . . . services during the same time periods."

While cross-examining Golden, the defendant presented him with, and questioned him about, the arrest warrant application. The defendant did so after having the arrest warrant admitted into evidence as a full exhibit, without limitations, following the court's admonition that, if the arrest war-

defendant had repeatedly billed the department for in-person, face-to-face services he claimed to have provided for department clients in Connecticut when in fact, as the travel logs revealed, he was in Texas.[17]

After the state rested its case on August 29, 2022, the defendant filed a motion for a judgment of acquittal, claiming that the evidence was insufficient to prove the state's case beyond a reasonable doubt.[18] In particular, he argued that the evidence was insufficient "to prove specific intent . . . ." His primary focus in advancing this argument was that the state had failed to present evidence of any misconduct on his part. He maintained, in this regard, that the state failed to introduce evidence that (1) he had provided services in any improper setting or (2) the services for which payment was sought were

rant "comes into evidence, that means I can read it. I haven't read it because I'm the fact finder. So, I don't want to see anything that has the facts presented. It's up to me to find the facts. Okay? So, if you offer that into evidence, then I can read it. If you don't mind, then that's fine. But I just wanted to warn you."

[17] On July 1, 2018, for example, the defendant submitted billings for a total of twelve hours of face-to-face services, allegedly provided to six recipients for two hours each, in their Connecticut homes, while the defendant was in fact in Texas. On July 2, 2018, he submitted billings for a total of twelve hours of face-to-face services, allegedly provided to six other recipients for two hours each, in their Connecticut homes, also while the defendant was in fact in Texas. On July 5, 2018, he submitted billings for a total of eleven hours of face-to-face services, allegedly provided to eleven recipients for one hour each, in their Connecticut homes, again while the defendant was in fact in Texas. Face-to-face services to eight of those eleven recipients had also allegedly been rendered, in their Connecticut homes while the defendant was in fact in Texas, on either July 1 or2, 2018. Finally, on July 6, 2018, he submitted billings for a total of thirteen hours of face-to-face services allegedly provided to twelve recipients, in their Connecticut homes, for one or two hours each, while the defendant was in fact in Texas. Face-to-face services had allegedly been rendered, from Texas, to all of those recipients in their Connecticut homes on at least one other occasion on either July 1, 2 or 5, 2018.

[18] The defendant also had previously filed two motions to dismiss, which the court considered collectively, with the motion for a judgment of acquittal, and "include[d] in its rulings [on] the requests made within those motions."

not provided.[19] Moreover, he stated during argument on the motion that he had prepared and submitted his bills "the way [the department] asked me to do it. And [that is] the focus of my motion for [a] judgment of acquittal."

During the state's argument in response, the following colloquy took place between the court and the prosecutor:

"The Court: —[M]y question is that the defense had said that they billed. Whether or not it's face-to-face and nonface-to-face, that's not what [the defendant is] raising. What he's raising is that the services were provided, and there's no evidence before the court that the services were not provided.

"[The Prosecutor]: We would argue, Your Honor, that the services could not be provided while he was in Dallas, Texas, in terms of face-to-face. There's—been no evidence that there was any face-to-face consultation that occurred in that location while he was in Dallas, Texas. . . .

"The Court: All right. So, what you're saying, basically, is that if there was a billing of face-to-face because he was in Dallas, Texas, and . . . by the definition of face-to-face, that the service of face-to-face could not be provided? But, could the nonface-to-face have been provided?

"[The Prosecutor]: Nonface-to-face could be provided and was provided during those time periods, Your Honor. . . . It is . . . our contention that there were no face-to-face consultations during this time period."

---

[19] The defendant had alluded to the possibility that he may have been meeting with another provider or a "supporter" while he was in Dallas, Texas, and suggested that this would satisfy the definition of face-to-face services and establish that he had provided such services while he was not in Connecticut.

The court denied the defendant's motion for a judgment of acquittal as to the larceny charge and as to that portion of the health insurance fraud charge that alleged that the defendant had presented the department with written claims for benefits. The court granted the defendant's motion as to that portion of the health insurance fraud charge that alleged that the defendant had presented the department with oral claims for benefits.

After the court ruled on the defendant's motion for a judgment of acquittal, the defendant declined to present a case of his own in response to the state's case-in-chief. The court then canvassed the defendant regarding his decision not to testify and scheduled closing arguments for the following day.

During the state's closing argument, the prosecutor argued that "evidence has been submitted showing the actual claims were submitted to [the department]. . . . And that their total value for the claims is $13,650." He posited that "the state has provided sufficient evidence to prove beyond a reasonable doubt that the defendant billed for services that he could not render, that were not rendered when he was in Dallas, Texas, specifically rendered for 113 incidents[20] of face-to-face consultation over . . . four, effectively, week time periods for thirty different clients." (Footnote added.) In advancing this conclusion, he explained that "[w]e heard testimony that . . . [al]though they are . . . called face-to-face [services] . . . the client did not have to be present and . . . that is correct; however, the testimony was that . . . the way the program was designed is that . . . the only time that the client would [not] be present is when it would be impossible for him to be present . . . or if for some behavioral reason he [could not] be

---

[20] Our review of the record reveals that there were billings for 114 face-to-face consultations.

available. But remember, [we are] talking about interventions designed to increase an individual's cognitive and behavioral capabilities. How can that possibly . . . be done from Dallas, Texas? [There is] obviously no proximity whatsoever to the client. No proximity to any of the individuals that are there close to the client so that those actual interventions can take place or those actual activities or recommendations can actually occur at that time."

The prosecutor also stated: "How . . . does one go to Texas and then bill for a number of days for multiple clients for multiple hours?

"Calling in reference to exhibit number twenty-nine, which is for the billings for the period of June 30th through the 6th . . . of July, 2018, I call attention [to the fact] that [there are] billings [for] both face-to-face and nonface-to-face consultations. And we heard testimony that, based on the billing requirements of [the department], [they are] done in fifteen minute units. So, if services were provided for an hour, there would be four units. . . . For two hours, it would be eight units. On the day of July 1st, 2018, we see billings for six clients at two hours apiece totaling twelve hours of face-to-face consultation.

"On . . . July 2nd, 2018, we again see billings for six different clients for eight periods apiece, which means a total of two hours each for twelve hours. On July 5th, we see four-hour billings, and for a total of eleven different clients, eleven hours. And on July 6th, we see billings for thirteen hours for twelve different clients. . . . Thirteen hours when [you are] out of state in Dallas, Texas, for twelve separate clients that [you are] billing for to provide, and let's go back to the definition, to provide individual interventions designed to increase an individual's cognitive and behavioral capacities and

to further the individual's adjustment to successful community engagement. Again, how does one go to Dallas, Texas, and provide those types of services?"

After the prosecutor concluded his remarks, the following colloquy between the court and the prosecutor ensued:

"The Court: . . . [I]f it's billed face-to-face, what about if there was nonface-to-face actions being done in a face-to-face billing?"

"[The Prosecutor]: They would have to be billed for fifteen minute [increments] separately.

"The Court: But you don't know if the bill—if it's— and it's all allegation, obviously . . . either face-to-face billing and he did nonface-to-face work, just billed at a higher [rate]?

"[The Prosecutor]: That . . . we don't know, Your Honor. We just know that he billed for face-to-face consultations . . . while he was in Texas, and he also billed for nonface-to-face."

The court announced its verdict in open court on October 4, 2022, and memorialized that verdict in a written decision that same day. The court found the defendant not guilty of larceny in the first degree by defrauding a public community and guilty of health insurance fraud.

In acquitting the defendant on the larceny charge, the court found that the state had proven the first three elements of larceny in the first degree by defrauding a public community—particularly, that the defendant (1) had authorized, certified, attested or filed claims for benefits from a local, state or federal agency; see General Statutes § 53a-119 (6) (A);[21] (2) knew that these

---

[21] The court found that the state had charged the defendant with violating § 53a-119 (6) (A) and (B) as alternative theories. It further found that the state proved that the defendant had violated § 53a-119 (6) (A) and thus did not address § 53a-119 (6) (B).

claims for benefits were false, and (3) intended to deprive a public community of the value of those claims. The court stated that "[t]he evidence presented supports the position that payment requests were filed for counseling services which were proved to be inaccurate."[22]

The court explained that "the state has presented evidence that the defendant submitted billing requests for money payment for the consulting completed, [that] the evidence establishes that the billing was sent for face-to-face consultation rather than nonface-to-face consultation" and that "[t]here is a payment differential between the two codes." It found, however, that, although the state had proved that there were inaccuracies with respect to the claims for payment for counseling services the defendant submitted to the department, the state had not proved that the amount by which such claims were inflated exceeded $2000.

As part of its discussion of "[e]lement 4—[v]alue," the court stated that, "[*w*]*ith the larceny statute*, an element that must be proved by the state beyond a reasonable doubt, is that the defendant *wrongfully obtained* property[23] from the owner," that " 'wrongfully' means that the defendant had no legal justification or excuse for 'obtaining' [or] 'taking' the property," and that " 'obtaining' includes, but is not limited to, bringing about the transfer of property from the owner to the defendant or a third person." (Emphasis added; footnote added.) The court specified that it had "reviewed

---

[22] The court specifically credited several of the state's exhibits to support its conclusion, including exhibits 29, 30, 31 and 32, which are the four spreadsheets listing all of the claims the defendant submitted, for both face-to-face and nonface-to-face services, between the following dates: June 30 and July 6, 2018; August 31 and September 7, 2018; November 16 and 23, 2018; and December 24, 2018, and January 1, 2019.

[23] The court had previously indicated that, "[i]n this matter, the property is money—currency."

the credible evidence presented *and not presented* on this element" and found that "the state has not established beyond a reasonable doubt that the defendant has 'obtained' the property *as that term is defined*." (Emphasis added.) It further found that "the facts presented fail to establish beyond a reasonable doubt what is the value for not claimed, if any was accomplished. It raises to the court a question of what is the value/claimed lost, and if ever, obtain[ed] by the defendant."

The court then noted that "[o]ur law states that, when value cannot be established beyond a reasonable doubt, a fact finder can set value as less than $50." It declined, however, to "find the value and value obtained element proven beyond a reasonable doubt with a court-negotiated alternate amount," and thus it acquitted the defendant of larceny in the first degree by defrauding a public community.

In addressing the health insurance fraud charge, the court first tracked the elements of § 53-442 and found that the credible evidence established that the state had proven each such element beyond a reasonable doubt. Specifically, the court found that the defendant had "presented or caused to be presented a written statement . . . [t]o an insurer[24] . . . [k]nowing that the statement contained false, incomplete, deceptive or misleading information concerning any fact or thing material to such claim, [a]nd . . . [t]he defendant did so with the specific intent to defraud."[25] (Footnote

[24] The court, citing to General Statutes § 53-441 (c), stated that " '[i]nsurer' means any insurance company . . . or any legal entity authorized to provide health care benefits in this state" and relied on "the evidence presented, including testimony by witnesses the court has found credible" to support its conclusion.

[25] With respect to the "intent to defraud" element, the court explained that "[t]he word 'defraud' means to practice fraud to deprive a person of property" and that "[t]he meaning of 'fraud' both in its legal usage and its common usage is the same, a deliberately planned purpose and intent to cheat or deceive someone of some property." Moreover, the court specifically credited state's exhibits 29, 30, 31 and 32, among others; see footnote 22 of this opinion; as well as the testimony of Bruni, in reaching this conclusion.

added.) As such, the court found the defendant guilty of health insurance fraud.

The court then turned to § 53-443, the penalty statute for health insurance fraud, which provides in relevant part that a person who violates § 53-442 "shall be subject to the penalties for larceny under sections 53a-122 to 53a-125b, inclusive . . . ." General Statutes § 53-443. The court reiterated that it had "found that the state has not proved the elements of count one—larceny" in the first degree by defrauding a public community—because the element of "value and obtaining was not proved beyond a reasonable doubt." It therefore determined that the crime of health insurance fraud, as proven in this case, is a crime of the same grade or degree as larceny in the sixth degree, a class C misdemeanor, for which the value of the wrongfully appropriated property or services must be $500 or less.[26] See General Statutes § 53a-125b.[27]

After the court announced its verdict, but prior to sentencing the defendant, the prosecutor asked the court whether a presentence investigation report (PSI) would be appropriate.[28] The court responded by reiterating its conclusion that the defendant's offense was a

[26] The state did not, at any time, seek to amend the information to charge the defendant with the lesser offense of larceny in the sixth degree in violation of General Statutes § 53a-125b. Nor did the state or the defendant request that the court consider, before rendering its verdict, whether the defendant should be convicted of that lesser offense. See, e.g., *State* v. *Whistnant*, 179 Conn. 576, 588, 427 A.2d 414 (1980) (entitlement to jury charge on, or trial court's consideration of, lesser offense requires, among other things, that request for same, by either state or defendant, be made).

[27] General Statutes § 53a-125b provides: "(a) A person is guilty of larceny in the sixth degree when he commits larceny as defined in section 53a-119 and the value of the property or service is five hundred dollars or less.

"(b) Larceny in the sixth degree is a class C misdemeanor."

[28] General Statutes § 54-91a provides in relevant part: "(a) No defendant convicted of a crime, other than a capital felony under the provisions of section 53a-54b in effect prior to April 25, 2012, or murder with special circumstances under the provisions of section 53a-54b in effect on or after April 25, 2012, the punishment for which may include imprisonment for more than one year, may be sentenced, or the defendant's case otherwise

"C misdemeanor," for which a PSI need not be ordered. It then sentenced the defendant to a term of three months of incarceration, execution suspended, and eighteen months of probation with special conditions.[29] The defendant thereafter appealed from the judgment of conviction of health insurance fraud.

On October 25, 2022, the state filed a motion to correct an illegal sentence, claiming that the trial court had applied the wrong sentencing statute when it sentenced the defendant for health insurance fraud. Focusing on the fact that the conduct underlying the defendant's conviction involved defrauding a public community, the state argued that "the only two sentencing provisions that could be applicable [to such conduct] would be those set forth in General Statutes § 53a-122 or General Statutes (Rev. to 2017) § 53a-123,"[30] and thus that

disposed of, until a written report of investigation by a probation officer has been presented to and considered by the court . . . but any court may, in its discretion, order a presentence investigation for a defendant convicted of any crime or offense other than a capital felony under the provisions of section 53a-54b . . . or murder with special circumstances under the provisions of section 53a-54b . . . ."

Although the legislature amended § 54-91a since the events at issue; see Public Acts 2021, No. 21-40, § 54; Public Acts 2019, No. 19-64, § 12; those amendments have no bearing on the merits of this appeal. In the interest of simplicity, we refer to the current revision of § 54-91a.

"The sole purpose [of a PSI] is to enable the court, within limits fixed by statute, to impose an appropriate penalty, fitting the offender as well as the crime. . . . The primary value of a PSI stems from the information contained therein, not from the report itself. Most of this information can be brought to the trial court's attention by either party by means other than a PSI." (Internal quotation marks omitted.) *State* v. *Miller*, 56 Conn. App. 191, 201, 742 A.2d 402 (1999), cert. denied, 252 Conn. 937, 747 A.2d 4 (2000). In accordance with § 54-91a, the court has the discretion not to order a PSI before proceeding to sentencing on a misdemeanor conviction.

[29] Thereafter, the prosecutor referenced "the question of the amount of money," presumably for purposes of seeking restitution, but then acknowledged that "there wasn't an established amount of money" and did not pursue the issue. See General Statutes § 53-443.

[30] General Statutes (Rev. to 2017) § 53a-123, which pertains to larceny in the second degree, a class C felony, provides in relevant part: "(a) A person is guilty of larceny in the second degree when he commits larceny, as defined

the court should "apply the sentencing provisions for § 53a-123, by way of § 53-443, and resentence the defendant accordingly." The state further noted in its motion that "the court's imposition of eighteen months of probation also constitutes an illegal sentence under the larceny in the sixth degree statute, a class C misdemeanor. The maximum period of probation for a class C misdemeanor is one year. General Statutes § 53a-29 (d) (4)."[31]

The defendant filed three objections to the state's motion to correct an illegal sentence, the last of which was drafted and filed by his newly retained defense counsel[32] as a "supplemental memorandum offer[ing] additional reasons [beyond those previously articulated by the defendant in his submissions as a self-represented party] to deny the state's motion to correct an illegal sentence.", The defendant had argued, while still self-represented, among other things, that "[t]here can be no finding of guilty (health insurance fraud) when there was no evidence related to value presented during

in section 53a-119, and . . . (4) the property is obtained by defrauding a public community, and the value of such property is two thousand dollars or less . . . ."

In 2022, the legislature amended § 53a-123 to delete subsection (a) (1), which pertained to larceny of a motor vehicle, and renumbered the remaining subsections such that § 53a-123 (a) (4) became § 53a-123 (a) (3). See Public Acts 2022, No. 22-115, § 9.

All references herein to § 53a-123 are to the 2017 revision of that statute unless otherwise indicated.

[31] General Statutes § 53a-29 provides in relevant part: "(d) Except as provided in subsection (f) of this section, the period of probation or conditional discharge, unless terminated sooner as provided in section 53a-32 or 53a-33, shall be as follows . . . (4) for a class B, C or D misdemeanor, not more than one year . . . ."

Although the legislature amended § 53a-29 since the events at issue; see Public Acts 2019, No. 19-189, § 14; that amendment has no bearing on the merits of this appeal. In the interest of simplicity, we refer to the current revision of § 53a-29.

[32] Counsel filed an appearance for the defendant on March 19, 2022, after the state filed its motion to correct an illegal sentence.

trial" and, consequently, that his conviction should be vacated in its entirety. (Emphasis omitted.) Alternatively, his counsel argued that the court "should conclude that the [defendant's] conviction for health insurance fraud was a violation [for which no jail sentence can lawfully be imposed] and [thus that the court should] impose a fine in lieu of the probationary sentence. . . . [If, however] the court concludes that the conviction was a crime, the court should grant that portion of the state's motion to correct that seeks correction of the length of probation, but otherwise deny the state's motion."

The court heard argument on the state's motion to correct an illegal sentence on March 22, 2023.[33] Thereafter, on May 12, 2023, the court filed a memorandum of decision granting the motion in part and denying it in part, and then resentenced the defendant to a term of three months of incarceration, execution suspended, and one year of probation. In so doing, the court rejected the state's principal argument that the defendant should be sentenced in accordance with § 53a-123 (a) (4), a class C felony, as well as defense counsel's argument that the defendant's conviction of health insurance fraud amounted only to a violation, not a crime. Instead, it agreed with both parties that the probationary portion of the defendant's initial sentence was unlawful because the maximum period of probation for a class C misdemeanor is one year.[34]

---

[33] During oral argument, the prosecutor contended that "the state had charged larceny one, and so . . . in order to establish a criminal violation of the larceny one statute in count two, it would have to establish that the value of the money obtained was in excess of $2000. And I believe the [court's] findings with respect to the verdict are [that] the state did not prove beyond a reasonable doubt an excess of $2000." The court deemed the prosecutor's recitation "correct."

[34] Although the court did not expressly reject the defendant's argument that his conviction of health insurance fraud should be vacated, it did so implicitly by resentencing the defendant for that crime. See *State* v. *Mieles*, 221 Conn. App. 164, 174, 301 A.3d 1063 (when construing court's judgment, "[e]ffect must be given to that which is clearly implied as well as to that

At the beginning of its decision, the court set forth procedural history explaining that it acquitted the defendant of larceny in the first degree by defrauding a public community because it had "found that the state failed to prove two elements of the charged crime; to wit, that the defendant had wrongfully obtained property, and that the value of the property exceeded [$2000]."[35] It further explained, with respect to the penalty for health insurance fraud, that, "because the state failed to prove value beyond a reasonable doubt, [value] was determined, pursuant to statute, 'to be an amount less than fifty dollars.' General Statutes § 53a-121 (a) (3)."[36] As such, the court determined that the defendant's conviction, under the standards established in the larceny statutes, constituted a class C misdemeanor, which is committed "when 'the value of the [wrongfully obtained] property or service is five hundred dollars or less.' " General Statutes § 53a-125b (a). "The court subsequently sentenced [the defendant to a term of] three months [of] incarceration, execution suspended, and eighteen months of probation." The court then turned to the merits of the state's claims.

In rejecting the state's principal argument, the court explained that it would not assess the defendant's penalty for health insurance fraud as one for larceny in the

which is expressed" (internal quotation marks omitted)), cert. granted, 348 Conn. 920, 303 A.3d 1195 (2023).

[35] We note that the court did not accord separate treatment to the "wrongfully obtained" element when it rendered its verdict. As previously stated, the court incorporated its discussion of the wrongfully obtained "[element] of the crime [of] larceny" into its analysis of the value element of the "specific section . . . charged" and thereafter declined to "find the value and value obtained element proven beyond a reasonable doubt . . . ." In other words, the court considered these elements together before concluding that the state had failed to prove beyond a reasonable doubt that the value of the property exceeded $2000.

[36] General Statutes § 53a-121 provides in relevant part: "(a) . . . (3) When the value of property or services cannot be satisfactorily ascertained pursuant to the standards set forth in this section, its value shall be deemed to be an amount less than fifty dollars. . . ."

second degree, which is a class C felony, because that offense required proof beyond a reasonable doubt that the value of the services or property wrongfully obtained by the defendant was $2000 or less. The court "emphasized that the state [had] failed to prove that *any* specific monetary value could be ascribed to the defendant's crime. Although value was set at an amount less than $50, that was merely done in accordance with § 53a-121 (a) (3), which applies [w]hen the value of property or services *cannot be satisfactorily ascertained* . . . . More importantly, the value of property [or services] stolen or obtained by fraud is an *essential element* of [a] crime when the value is used to *differentiate between a felony and a misdemeanor.* . . . Consequently, because the state failed to sufficiently prove the value of the services appropriated, the greatest that this court could assess the defendant's penalty [was] . . . at a misdemeanor offense." (Citations omitted; emphasis in original; internal quotation marks omitted.)

The court further stated that, "assuming, arguendo that the defendant's penalty could be assessed at either larceny in the sixth degree *or* larceny in the second degree," both of which would encompass the value the court set at an amount less than $50, "this court is aware of no authority mandating a sentence pursuant to the latter as opposed to the former. Rather, a trial court possesses great discretion when sentencing a defendant within statutory limits. . . . Such discretion certainly encompasses decisions regarding which of two lawful statutes the court believes is appropriate given the circumstances of a particular defendant's offense." (Citations omitted; emphasis in original; footnote omitted.)[37]

---

[37] We note that the court's decision to sentence the defendant in accordance with the statute that affords the lighter punishment is consistent with its conclusion that the defendant's crime was "a C misdemeanor." The court's refusal to deviate from its initial decision not only maintains consistency but is also reflective of the rule of lenity, "which provides that penal laws generally are to be construed strictly against the state . . . and [that] ambi-

The court agreed, however, with "both parties [that] the probation[ary] portion of the defendant's sentence must be corrected," and thus it made that correction by resentencing the defendant to a term of three months of incarceration, execution suspended, and one year of probation on his conviction of health insurance fraud. Thereafter, the defendant amended his appeal to challenge the "[j]udgment of guilty of health insurance fraud, as modified by [the court's] ruling on the state's motion to correct [an] illegal sentence." Additional facts and procedural history will be set forth as necessary.

I

We first address the defendant's claim that the trial court "violated the double jeopardy clause when it reversed [his] acquittal on the 'value' element of larceny in response to the state's motion to correct an illegal sentence." As a result of that alleged reversal, the defendant argues, he was deprived of his right to be acquitted on the parallel charge of health insurance fraud, which was based upon the defendant's same allegedly wrongful submission of claims for payment for providing face-to-face services to the department's clients in Connecticut when the defendant was out of the state. The defendant claims, more particularly, that, although the court initially acquitted him of larceny on October 4, 2022, because it concluded that any property he had wrongfully obtained from the department had no proven value—not even a value of " 'less than fifty dollars' "— it reversed that decision in its May 12, 2023 memorandum of decision on the state's motion to correct an illegal sentence by determining, assertedly "[f]or the first time," that the wrongfully obtained property did have value, albeit in an amount less than $50. The state

guities are ordinarily to be resolved in favor of the defendant." (Citation omitted; internal quotation marks omitted.) *American Promotional Events, Inc.* v. *Blumenthal*, 285 Conn. 192, 205, 937 A.2d 1184 (2008).

disagrees, arguing that the "court's decision on the motion to correct is wholly consistent with its verdict after trial and did not reverse anything." We agree with the state.

We begin our analysis by setting forth our standard of review and several relevant legal principles. "[O]ur standard of review for analyzing constitutional claims such as double jeopardy violations prohibited by the fifth amendment to the United States constitution presents an issue of constitutional and statutory interpretation over which our review is plenary. . . . The fifth amendment to the United States constitution provides in relevant part: No person shall . . . be subject for the same offense to be twice put in jeopardy of life or limb . . . . The double jeopardy clause of the fifth amendment is made applicable to the states through the due process clause of the fourteenth amendment." (Citation omitted; internal quotation marks omitted.) *State* v. *Purvis*, 227 Conn. App. 188, 212, 321 A.3d 1158, cert. denied, 350 Conn. 922, 325 A.3d 1093 (2024).

"The United States Supreme Court has explained that the fifth amendment guarantee against double jeopardy . . . gives rise to three separate constitutional protections. . . . It protects against a second prosecution for the same offense after acquittal. It protects against a second prosecution for the same offense after conviction. And it protects against multiple punishments for the same offense." (Citation omitted; footnote omitted; internal quotation marks omitted.) *Harris* v. *Commissioner of Correction*, 271 Conn. 808, 842, 860 A.2d 715 (2004). The defendant's present claim invokes the first of these protections under the collateral estoppel branch of double jeopardy jurisprudence. See *Ashe* v. *Swenson*, 397 U.S. 436, 445, 90 S. Ct. 1189, 25 L. Ed. 2d 469 (1970) (fifth amendment guarantee against double jeopardy, as applied to states under due process clause

of fourteenth amendment, imposes collateral estoppel rule as constitutional requirement).

"Collateral estoppel means simply that when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit. . . . To establish whether collateral estoppel applies, the court must determine *what facts were necessarily determined in the first trial*, and must then assess whether the government is attempting to relitigate those facts in the second proceeding. . . . A defendant who seeks to protect himself from being retried pursuant to the principles of collateral estoppel carries the burden of establishing that the issue he seeks to foreclose from consideration in the second case was necessarily *resolved in his favor* in the prior proceeding." (Citation omitted; emphasis in original; internal quotation marks omitted.) *State* v. *Crawford*, 257 Conn. 769, 781, 778 A.2d 947 (2001), cert. denied, 534 U.S. 1138, 122 S. Ct. 1086, 151 L. Ed. 2d 985 (2002).

To determine what facts were necessarily resolved in the defendant's favor in the prior proceeding—in the present case, the defendant's court trial on the larceny charge—we must construe the court's October 4, 2022 judgment in that proceeding. "The construction of a judgment presents a question of law subject to plenary review. . . . In construing a trial court's judgment, [t]he determinative factor is the intention of the court as gathered from all parts of the judgment. . . . The interpretation of a judgment may involve the circumstances surrounding the making of the judgment. . . . Effect must be given to that which is clearly implied as well as to that which is expressed. . . . The judgment should admit of a consistent construction as a whole." (Citation omitted; internal quotation marks omitted.) *State* v. *Mieles*, 221 Conn. App. 164, 174, 301

A.3d 1063, cert. granted, 348 Conn. 920, 303 A.3d 1195 (2023).

Moreover, "we are mindful that our appellate courts do not presume error on the part of the trial court. . . . Rather, we presume that the trial court, in rendering its judgment . . . undertook the proper analysis of the law and the facts. . . . Absent an indication to the contrary, we therefore must assume [that] the court acted properly." (Citations omitted; internal quotation marks omitted.) *Wethersfield* v. *PR Arrow, LLC*, 187 Conn. App. 604, 661 n.45, 203 A.3d 645, cert. denied, 331 Conn. 907, 202 A.3d 1022 (2019); see also *RBC Nice Bearings, Inc.* v. *SKF USA, Inc.*, 318 Conn. 737, 753, 123 A.3d 417 (2015) ("this court construes ambiguous memorandum of decision to support judgment"). Finally, when a court interprets its own order, we accord substantial deference to that interpretation unless that interpretation is manifestly unreasonable. See *Lawrence* v. *Cords*, 159 Conn. App. 194, 199, 122 A.3d 713 (2015) ("because the trial judge who issues the order that is the subject of subsequent clarification is familiar with the entire record and, of course, with the order itself, that judge is in the best position to clarify any ambiguity in the order" (internal quotation marks omitted)), cert. denied, 322 Conn. 907, 140 A.3d 221 (2016).

In rendering the October 4, 2022 judgment, the court was tasked with deciding whether the state had sustained its burden of proving that the defendant was guilty of (1) larceny in the first degree by defrauding a public community in violation of § 53a-122 (a) (4), and (2) health insurance fraud in violation of § 53-442, as charged in this case.[38] Section 53a-122 provides in relevant part: "(a) A person is guilty of larceny in the first

_____

[38] Specifically, the court had to decide whether the state had proven that the defendant (1) "with the intent to defraud a public community [the department] . . . authorized, certified, attested or filed multiple claims for benefits or reimbursements . . . which he knew were false or knowingly accepted the benefits from claims he knew [were] false with the intent to

degree when he commits larceny, as defined in section 53a-119, and . . . (4) the property is obtained by defrauding a public community, and the value of such property exceeds two thousand dollars. . . .''

By the time the court reached what it identified as ''[e]lement 4'' of the larceny charge, which required the state to prove that the ''[v]alue of the claim exceed[ed] $2000,'' the court had already found that the state had proven that the defendant had presented the department with claims for payment that he knew to be false and that he thereby intended to deprive a public community, i.e., the department, of the unearned value of those claims. Specifically, the court determined that the state had ''presented evidence that the defendant submitted billing requests for money payment for the consulting completed,'' ''that the billing was sent for face-to-face consultation rather than nonface-to-face consultation,'' and that ''[t]here is a payment differential between the two codes.'' Because the defendant was in Dallas, Texas, at the time he claimed to have performed face-to-face consultations in program participants' homes, all of which were in Connecticut, the court expressly found that ''payment requests were filed for counseling services which were proved to be inaccurate.''[39] Even

permanently deprive [the department] of the value of the claims, and the value of the claims exceed[ed] . . . [$2000]. To Wit: in violation of . . . § 53a-122 (a) (4) by way [of] § 53a-119 (6) (A) [or] (B). . . . [and 2] with the intent to defraud or deceive [the department], acting as an insurer, presented or caused to be presented, any written or oral statements as part of or in support of applications for payments, claims or other benefits from a plan providing health care benefits, to wit: Medicaid insurance; that the statements were presented [to the department], the defendant knew the statements contained false, incomplete, deceptive or misleading or omitted information material to the claim, whether for himself, a family member or a third party, with intent to defraud. To Wit: In violation of . . . § 53-442 by way of § 53-443.''

[39] We note that the defendant broadly posits that he ''committed no fraud'' and suggests that he provided services that satisfy the definition of ''face-to-face services'' by meeting in person with other providers or supporters while he was in Texas. He has not, however, briefed a claim on appeal, challenging, as clearly erroneous, the court's finding that the billings for

so, it explained that the payments the defendant had requested and received as a result of those inaccurate payment requests had to have been obtained "wrongfully," meaning that the defendant had to have "had no legal justification or excuse for 'obtaining' [or] 'taking' " them, and it found that the state had not proven this to be the case. Specifically, the court found that the state had "not established beyond a reasonable doubt that the defendant has 'obtained' the property as that term is defined"—i.e., wrongfully—and that the "facts presented fail to establish beyond a reasonable doubt what is the value for not claimed, if any was accomplished. It raises to the court a question of what is the value/claimed lost, and if ever, obtain[ed] by the defendant."

We construe these findings regarding "value and obtaining," which collectively informed the court's conclusion that the state had not sustained its burden of proving beyond a reasonable doubt that the value of the wrongfully obtained property exceeded $2000, within the context of the court's consistently expressed concerns throughout the proceedings about the possibility that the defendant may have rendered some services on the dates in question, even if he had coded them incorrectly, and that he may have been entitled to a portion of what the department had paid him, if that were the case. See *State* v. *Mieles*, supra, 221 Conn. App. 174 ("[t]he interpretation of a judgment may involve the circumstances surrounding the making of the judgment" (internal quotation marks omitted)). During oral argument on the defendant's motion for a judgment of acquittal, for example, the court acknowledged

face-to-face services were inaccurate. Nevertheless, as set forth in more detail in part II of this opinion, we conclude that the court reasonably could have found, on the basis of the evidence and the reasonable inferences drawn therefrom, that the defendant had submitted claims to the department for services he did not and/or could not have provided.

the defendant's argument "that the services were provided and there's no evidence before the court that services were not provided," and it questioned whether services, though billed improperly as face-to-face consultations, might nonetheless have constituted nonface-to-face services for which the defendant was entitled to be paid, albeit at a lower rate. Similarly, during the state's closing argument, the court questioned the prosecutor as to whether he knew if the defendant actually "did nonface-to-face work, just billed at a higher [rate]," and the prosecutor conceded that he did not know. The prosecutor was clear that the state was relying solely on the $13,650 "total value" of the claims the defendant had submitted for payment of face-to-face services to prove that the value of the property the defendant had wrongfully obtained from the department exceeded $2000.

As such, although the court found that the defendant had in fact submitted claims that were knowingly inaccurate, after "review[ing] the credible evidence presented *and not presented* on [the value] element," it could not ascertain what portion of the $13,650 total he was paid on those claims had been *wrongfully* obtained, or thus whether the total value of such wrongfully obtained payments exceeded $2000, as the state was required to prove. (Emphasis added.) The court thus concluded that the value of the wrongfully obtained payments could not be "satisfactorily ascertained" based on the evidence that was submitted because the evidence did not address whether nonface-to-face services had been provided but billed, improperly, as the face-to-face services that formed the basis for the larceny charge. The court therefore was unable to conclude that the state had proven that the "[v]alue of the claim exceeds $2000" for purposes of securing a conviction of larceny in the first degree by defrauding a public community. See General Statutes § 53a-121.

In this regard, § 53a-121 (a) (3) expressly provides that, in a prosecution for larceny, when "the value of property or services cannot be satisfactorily ascertained . . . its value shall be deemed to be an amount less than fifty dollars." Although the court did not expressly reference this statute when it announced its verdict, it nonetheless noted that "[o]ur law states that, when value cannot be established beyond a reasonable doubt, a fact finder can set value as less than fifty dollars." Moreover, immediately after making this statement it stated that it "will not find the value and value obtained element proven beyond a reasonable doubt with a court-negotiated *alternate* amount . . . ." (Emphasis added.) We discern from these statements that the court deemed the value of the wrongfully obtained funds to be an unascertainable amount less than $50 in accordance with § 53a-121, but that it declined to set a specific value for those funds in excess of the $2000 threshold set forth in § 53a-122 (a) (4) because it was unable to ascertain from the evidence what portion of the $13,650 the defendant had *wrongfully* obtained. See *State* v. *Mieles*, supra, 221 Conn. App. 174. For that reason, the court acquitted the defendant of larceny in the first degree by defrauding a public community.

After so doing, the court addressed the charge of health insurance fraud. As charged in this case, § 53-442 provides: "A person is guilty of health insurance fraud when he, with the intent to defraud or deceive any insurer, (1) presents or causes to be presented to any insurer or any agent thereof any written or oral statement as part of or in support of an application for any policy of insurance or claim for payment or other benefit from a plan providing health care benefits, whether for himself, a family member or a third party, knowing that such statement contains any false, incomplete, deceptive or misleading information concerning

any fact or thing material to such claim or application, or omits information concerning any fact or thing material to such claim or application." The court found that the credible evidence established that the state had proven each essential element of the crime of health insurance fraud; see General Statutes § 53-442; and thus it found the defendant guilty as charged.

To set the penalty for health insurance fraud, the court then turned to the sentencing provisions for that crime, which are set forth in § 53-443. Section 53-443 provides in relevant part: "Any person who violates any provision of sections 53-440 to 53-443, inclusive, shall be subject to the penalties for larceny under sections 53a-122 to 53a-125b, inclusive. . . ." The court reiterated, before setting the penalty, that it had "found that the state has not proved the elements of count one— larceny" because the "value and obtaining" element of that crime "was not proved beyond a reasonable doubt." By these words, the court reaffirmed that the state had not proved beyond a reasonable doubt that the defendant *wrongfully obtained* from the department payments in excess of $2000, as required for the state to obtain a conviction of larceny in the first degree by defrauding a public community. The court therefore set the penalty for health insurance fraud as one for "larceny in the sixth degree, § 53a-125b . . . a class C misdemeanor," which applies to the wrongful appropriation of property or services with a value of $500 or less. This conclusion is consistent with the court's having deemed the value of the property to be an amount less than $50 in accordance with § 53a-121. See *State* v. *Mieles*, supra, 221 Conn. App. 174 ("[e]ffect must be given to that which is clearly implied as well as to that which is expressed" (internal quotation marks omitted)).

Thereafter, in its May 12, 2023 memorandum of decision on the state's motion to correct an illegal sentence,

the court reiterated that it acquitted the defendant of larceny in the first degree by defrauding a public community because it found that the state had failed to prove "that the defendant had wrongfully obtained property, and that the value of such property exceeded two thousand dollars." It further explained that it had determined value, "pursuant to statute, 'to be an amount less than fifty dollars' " and that it had done so in accordance with § 53a-121 (a) (3), "which applies '[w]hen the value of property or services *cannot be satisfactorily ascertained.*' " (Emphasis in original.) On this basis, the court resentenced the defendant on his conviction of health insurance fraud by reducing the probationary portion of his sentence from eighteen months to one year, which is the maximum period of probation for a conviction of a class C misdemeanor.

We defer to the court's reasonable interpretation of its October 4, 2022 decision in our construction thereof; see *Lawrence* v. *Cords*, supra, 159 Conn. App. 199; and conclude that the court acquitted the defendant of larceny in the first degree by defrauding a public community because it found that the state had failed to prove that the value of the funds the defendant wrongfully obtained by way of the inaccurate requests for payment he submitted to the department exceeded $2000. Because the court could not satisfactorily ascertain how much of the $13,650 the defendant received was "wrongfully obtained"; see General Statutes § 53a-121; it set the value of the wrongfully obtained portion of those funds at $50 or less, and it later relied upon that value, as required by § 53-443, in determining that the grade or degree of the crime of health insurance fraud, as the defendant was shown to have committed, was that of a larceny in the sixth degree, a class C misdemeanor. Consequently, the court's subsequent May 12, 2023 memorandum of decision regarding the state's motion to correct an illegal sentence was consistent

with the court's initial acquittal on the larceny charge and did not alter the findings underlying that acquittal or the defendant's conviction of health insurance fraud in any way.

Although the court necessarily determined, when it acquitted the defendant of larceny in the first degree by defrauding a public community, that the state had failed to prove that the value of the funds the defendant wrongfully obtained did not exceed $2000, it nonetheless determined that there was a value to those funds that it could not ascertain and set that value at $50 or less. The court did not reassess, reconsider or change those findings in rendering its decision on the state's motion to correct an illegal sentence but, rather, reiterated them. Thus, the principles of collateral estoppel were not implicated, and the constitutional prohibition against double jeopardy was not violated as a result of the court's ruling on the state's motion to correct an illegal sentence.

## II

We now turn to the defendant's claim that "[t]he trial court violated the due process clause [of the fourteenth amendment] when it convicted the defendant of health insurance fraud without finding every fact necessary to constitute the crime." The defendant argues that, under the circumstances of this case, "where no conviction for larceny can be supported, and the defendant was acquitted of larceny, no conviction for health insurance fraud can stand." He posits that the court's determination that the state failed to prove the "obtaining" and "value" elements of larceny in the first degree by defrauding a public community required the court to acquit him of health insurance fraud, as well. We disagree.

As a preliminary matter, we address the nature of the defendant's due process claim and the manner in

which he has presented that claim on appeal. "It is an essential of the due process guaranteed by the [f]ourteenth [a]mendment that no person shall be made to suffer the onus of a criminal conviction except upon sufficient proof—defined as evidence necessary to convince a trier of fact beyond a reasonable doubt of the existence of every element of the offense." (Internal quotation marks omitted.) *State* v. *Kerr*, 107 Conn. App. 413, 419, 945 A.2d 1004, cert. denied, 287 Conn. 914, 950 A.2d 1290 (2008). "Each essential element of the crime charged must be established by proof beyond a reasonable doubt . . . [and] [w]here it cannot be said that a rational trier of fact could find guilt proven beyond a reasonable doubt, then, a conviction cannot constitutionally stand, as it is violative of due process under the fourteenth amendment." (Citations omitted; internal quotation marks omitted.) *State* v. *Scielzo*, 190 Conn. 191, 196–97, 460 A.2d 951 (1983). As such, the issue the defendant's claim raises "is whether the [trier] could have reasonably concluded, upon the facts established and the reasonable inferences drawn therefrom, that the cumulative effect of the evidence was sufficient to justify the verdict of guilty beyond a reasonable doubt." (Internal quotation marks omitted.) Id., 196.

Although the defendant's claim on appeal is that his conviction of health insurance fraud is not justified because the trial court did not "[find] every fact necessary to constitute the crime," the only argument he makes, in his appellate briefs, to support this conclusion, is that the court should have acquitted him of health insurance fraud because it acquitted him of larceny in the first degree by defrauding a public community. Specifically, he argues that, because, in acquitting him of larceny in the first degree, the court determined that the state had "failed to prove that there was *any* value to [the] property that was the object of the alleged fraud"; (emphasis added); it must also have found that

he "never wrongfully took or [intended] to take anything of any value," as required to convict him of and sentence him for health insurance fraud. The defendant does not also argue in his appellate briefs that, apart from the court's findings on the larceny charge, the evidence was insufficient to convict him of health insurance fraud. Although the defendant makes references throughout his brief to the evidence and testimony he claims the state failed to introduce and/or present, and he suggests that his billings were not shown to be inaccurate because the state did not prove that he did not meet with another provider or a "supporter" while he was in Dallas, Texas, he neither analyzes the evidence that was presented to the court nor explains, why, by reference to relevant law, such evidence provided an insufficient basis upon which to convict him of health insurance fraud. See, e.g., *C. B.* v. *S. B.*, 211 Conn. App. 628, 630, 273 A.3d 271 (2022) ("We repeatedly have stated that [w]e are not required to review issues that have been improperly presented to this court through an inadequate brief. . . . Analysis, rather than mere abstract assertion, is required in order to avoid abandoning an issue by failure to brief the issue properly. . . . For a reviewing court to judiciously and efficiently . . . consider claims of error raised on appeal . . . the parties must clearly and fully set forth their arguments in their briefs." (Internal quotation marks omitted.)).

Even so, during oral argument before this court, the defendant's appellate counsel made an argument that the state's appellate counsel acknowledged and characterized as an "insufficiency" argument and to which she made an argument in response. Thus, although we are not *required* to address the defendant's sufficiency of the evidence argument, we will do so. In so doing, we treat this due process claim by the defendant as having two parts, and we address each part in turn.

## A

We turn first to the defendant's argument that the trial court was required to acquit him of health insurance fraud because it found that the state had failed to prove the "obtaining" and "value" elements of larceny in the first degree by defrauding a public community.[40] As previously stated in part I of this opinion, the four essential elements of the crime of health insurance fraud are set forth in § 53-442, which provides in relevant part that "[a] person is guilty of health insurance fraud when he, [1] with the intent to defraud or deceive [2] any insurer . . . [3] presents or causes to be presented to any insurer or any agent thereof any written or oral statement as part of or in support of an application for any policy of insurance or claim for payment or other benefit from a plan providing health care benefits . . . [4] knowing that such statement contains any false, incomplete, deceptive or misleading information concerning any fact or thing material to such claim or application, or omits information concerning any fact

---

[40] As we explained in part I of this opinion, the court's findings regarding "value and obtaining" collectively informed its conclusion that the state had not proven the value element of larceny in the first degree by defrauding a public community. There is nothing in the plain language of § 53-442, however, that required the court to find that the defendant had wrongfully obtained anything of value in order to convict him of health insurance fraud. See *State* v. *Guadalupe*, 66 Conn. App. 819, 827, 786 A.2d 494 (2001) ("[w]hen interpreting statutes, we afford statutory language its plain and ordinary meaning and refrain from reading into statutes provisions that are not clearly stated" (internal quotation marks omitted)), cert. denied, 259 Conn. 907, 789 A.2d 996 (2002). Unlike the crime of larceny in the first degree by defrauding a public community, which requires proof of a wrongful taking of property with a value in excess of $2000 to support a conviction; see General Statutes § 53a-122; the crime of health insurance fraud is committed when a defendant, with the intent to defraud or deceive an insurer, knowingly *submits* a "false, incomplete, deceptive or misleading" statement in support of an insurance claim. *Connecticut General Life Ins. Co.* v. *Ogbebor*, Docket No. 3:21-cv-00954 (JAM), 2022 WL 4077988, *5 (D. Conn. September 6, 2022). Stated another way, it is the act of *submitting* an inaccurate claim that is the punishable offense under § 53-442.

or thing material to such claim or application . . . .” General Statutes § 53-442. The court identified these essential elements and found that the state had proven each one.

The defendant contends, however, that the court’s findings on the “intent to defraud or deceive” and the “material[ity]” elements of health insurance fraud cannot be reconciled with his acquittal on the larceny charge because these elements both require that the “alleged fraud concern something of value.” He argues that, even if the plain text of § 53-442 does not require a finding of some value in order to *convict* a defendant of health insurance fraud, § 53-443 requires a finding of *some* value in order to *punish* a defendant for committing that crime and that the two statutes must be read together. He then reiterates the basis for his claim that the court violated the double jeopardy clause when it issued its May 12, 2023 decision on the state’s motion to correct an illegal sentence—that the court found that the state had failed to prove that the property had any value whatsoever and that he “never wrongfully took or sought to take anything of any value” when the court acquitted him of larceny—and argues on that basis that the court should have acquitted him of health insurance fraud as well.

As we explained in part I of this opinion, however, because the court was unable to satisfactorily ascertain from the evidence what the specific value of the wrongfully obtained property was, or thus whether that value exceeded the $2000 threshold for proving the value element of larceny in the first degree by defrauding a public community, it set a value of $50 or less in accordance with § 53a-121 (a) (3) and acquitted the defendant of that crime. The court did not, as the defendant claims, find “that no value . . . was proven” when it did so. In fact, the court expressly found that “some

value [was] proven,'' which is precisely what the defendant claims the court was required to do. Thus, the predicate for the argument that the court's acquittal of the defendant on the larceny charge required his acquittal on the health insurance fraud charge because the wrongfully obtained property had already been found to have no value is simply wrong, and therefore, we reject this claim.

B

We next address whether there was sufficient evidence before the court upon which to convict the defendant of health insurance fraud and conclude that the evidence was sufficient to do so. We begin by setting forth our standard of review and the legal principles that are germane to our analysis. "The standard of review for a sufficiency of the evidence claim employs a two part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [fact finder] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. . . . This court cannot substitute its own judgment for that of the [fact finder] if there is sufficient evidence to support [its] verdict. . . .

"It is axiomatic that the [fact finder] must find every element proven beyond a reasonable doubt in order to find the defendant guilty of the charged offense, [but] each of the basic and inferred facts underlying those conclusions need not be proved beyond a reasonable doubt. . . . If it is reasonable and logical for the [fact finder] to conclude that a basic fact or an inferred fact is true, the [fact finder] is permitted to consider the fact proven and may consider it in combination with other proven facts in determining whether the cumulative effect of all the evidence proves the defendant

guilty of all the elements of the crime charged beyond a reasonable doubt. . . . On appeal, we do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the [fact finder's] verdict of guilty." (Internal quotation marks omitted.) *State* v. *Carter*, 141 Conn. App. 377, 384–85, 61 A.3d 1103 (2013), aff'd, 317 Conn. 845, 120 A.3d 1229 (2015).

As previously stated, § 53-442 sets forth the four essential elements of the crime of health insurance fraud. The court correctly identified these essential elements and found that the state had proven each one. Specifically, the court found that the defendant had "presented or caused to be presented a written statement . . . [t]o an insurer . . . [k]nowing that the statement contained false, incomplete, deceptive or misleading information concerning any fact or thing material to such claim [a]nd . . . [t]he defendant did so with the specific intent to defraud."

Section 53-443, in turn, establishes that the penalties for the crime of health insurance fraud are the "penalties for larceny under sections 53a-122 to 53a-125b, inclusive," and the penalties for larceny set forth in those statutes that § 53-443 incorporates are generally predicated upon the nature or value of the property that was wrongfully obtained by the defendant or the identity of the victim. See General Statutes §§ 53a-122 to 53a-125b. The court found, in this case, that the portion of the $13,650 the defendant had received from the department for in-person, face-to-face services he had billed for but had not actually provided to the department's clients could not be determined and thus was unascertainable. Accordingly, it assigned such wrongfully obtained property the statutory value of $50 or less; see General Statutes § 53a-121 (a) (3); and determined that the defendant's crime of health insurance

fraud was a class C misdemeanor. On that basis, the court modified his initial sentence after partially granting the state's motion to correct an illegal sentence by reducing the probationary portion of his sentence to one year, which is the maximum probationary sentence for a conviction of a class C misdemeanor.

In the present case, there is a reasonable view of the evidence that supports the court's findings and ultimate conclusion that the defendant was guilty of the crime of health insurance fraud, which the court properly graded and punished as a class C misdemeanor. Indeed, the cumulative effect of all the evidence supports the conclusion that the defendant had submitted bills to and received payments from the department for face-to-face services he simply could not have provided to or on behalf of program recipients in Connecticut while he was in Dallas, Texas, and that the proven value of the unearned portion of such payments was properly determined, pursuant to § 53a-121 (a) (3), to have a value of $50 or less.

The stated intention of the department's cognitive behavioral program "is to enable . . . individuals [who have suffered brain injuries], through person-centered planning, to receive home and community-based services necessary to allow such individuals to live in the community and avoid institutionalization." Regs., Conn. State Agencies § 17b-260a-1. The program's services are "performed within the context of the individual's person-centered team"; ABI Waiver I; and they are "designed to increase an individual's cognitive and behavioral capabilities and to further the individual's adjustment to successful community engagement." Regs., Conn. State Agencies § 17b-260a-8 (b) (7). As such, "[c]ognitive/ behavioral services may be provided in the individual's home or in the community in order to reinforce the training in a real-life situation." ABI Waiver I. Although services may be provided on a nonface-to-face basis, the

program incentivizes face-to-face services by offering providers a higher billing rate for face-to-face encounters.

The department had concerns about the defendant and Neurostrategies, Inc.'s billing practices, which prompted an investigation by the state's Medicaid fraud control unit. When that investigation revealed that the defendant was in Dallas, Texas, between June 30 and July 6, 2018; between August 31 and September 7, 2018; between November 16 and 23, 2018; and between December 24, 2018, and January 1, 2019; the fraud control unit's investigators "ran" the claims for payment that Neurostrategies, Inc., had submitted for services allegedly performed during those time periods. They determined, in so doing, that there were 114 claims made for face-to-face services allegedly provided to thirty different program participants while the defendant was in Texas and that the department had paid Neurostrategies, Inc., a total of $13,650 on the basis of those claims. There were claims made for nonface-to-face services rendered during those time periods as well. The "[f]acility [t]ype [c]ode [d]escription," however, for *all* of the claims submitted during those periods, whether face-to-face or nonface-to-face, was "12-[h]ome." This code was one of two codes used to designate the "location where services were performed." The other code, "99," was to be used for "[o]ther [p]lace of [s]ervice." See footnote 9 of this opinion.

Construing this evidence in the light most favorable to sustaining the defendant's conviction of health insurance fraud, the court reasonably could have determined that the defendant was expected to provide individualized "home and community-based" services to brain injured persons but that he simply could not have done so, in person and "face-to-face," with thirty different

clients in their homes on all 114 separate occasions,[41] while he was in Dallas, Texas, as his billings reflected. Thus, the court reasonably could have found, as it did, "that payment requests were filed for counseling services which were proved to be inaccurate" and concluded that the defendant was guilty, beyond a reasonable doubt, of the crime of health insurance fraud.[42] Indeed, the court specified that there was "evidence that the defendant submitted billing requests for money payment for the consulting completed, [that] the evidence establishes that the billing was sent for face-to-face consultation rather than nonface-to-face consultation" and that "[t]here is a payment differential between the two codes." In other words, there was evidence that some or all of the billings the defendant submitted to the department "contain[ed] false . . . deceptive or misleading information" because they represented that the defendant (1) had rendered face-to-face, in person services when he was in Dallas, Texas, although he could not have done so, and (2) sought payment at the higher rate offered for face-to-face services he did not provide. These findings, which address every fact necessary to prove the crime of health insurance fraud, are amply supported by the evidence and support the court's judgment of guilty. See General Statutes § 53-442; see also *State* v. *Carter*, supra, 141 Conn. App. 385.

The defendant argues, however, that his conviction of health insurance fraud cannot stand, not because of the evidence the state did submit but because of the

---

[41] We note that the state bore the burden of proving that the defendant had knowingly submitted to the department any single false, incomplete, deceptive or misleading "*statement* as part of or in support of . . . *any . . . claim for payment*" to secure a conviction of health insurance fraud. (Emphasis added.) General Statutes § 53-442. As such, the state did not have to prove that all of the 114 claims the defendant had made for face-to-face services rendered from Texas were false or fraudulent. Rather, proof of a single fraudulent claim would be sufficient for a conviction.

[42] See footnote 22 of this opinion.

evidence it did not submit. In his appellate brief, the defendant alludes to the possibility that his billings may not have been inaccurate because he may have been meeting with another provider or a "supporter" while he was in Dallas, Texas. This, he maintains, would have satisfied the definition of "face-to-face" services and thus established that he did provide such services while he was out of Connecticut. He argues that "[f]ace-to-face can mean face-to-face with a client's family, supporters, or other providers," as well as "interaction with a client through a contractor." To this end, he notes that there is no evidence that the face-to-face encounters for which he billed were for meetings with the program recipients themselves. He emphasizes that there was "no testimony from the recipients of the allegedly improperly billed services" and that "[n]o patients testified." Moreover, he points out that the state did not "introduce medical records" or "service plans for individuals receiving services" and that "[n]o document was introduced where [the defendant] specifically said that he met with a specific patient face-to-face on a specific day."

At oral argument before this court, the defendant's counsel argued that the state had "never proved that [the defendant's] being out of state necessarily means he [cannot] be billing for face-to-face [services]; for example, if [he is] with another provider or at a provider's conference or doing something else of that nature." Bruni testified, however, that the defendant's suggestion that he could meet in person with another provider or supporter, without the client present, and properly bill for a face-to-face consultation is not consistent with the intent of the program's regulations and/or its operational policy. Although she acknowledged that "[t]he policy specifically states that [the clients] do not need to be present," she testified that "somebody needs to

be present in order to have it be an in-person [face-to-face] service" and explained that "[t]he concept here is that, in the ABI waiver, the primary way that plans are discussed and cognitive behavioral interventions are planned is through the team meeting. Because of the nature of the acquired brain injury, sometimes clients get very agitated." As such, a provider would not necessarily be prohibited from working face-to-face with another provider without the client present, but "[i]t would be highly unusual." Indeed, face-to-face encounters command a higher billing rate than nonface-to-face encounters specifically "to encourage cognitive behavioral providers to engage their clients in person . . . ."

The billing spreadsheets the court expressly credited reflect a total of 114 claims for face-to-face services the defendant offered, all while he was in Texas, to or on behalf of thirty different clients, in their homes, often in back-to-back blocks that totaled upwards of ten hours per day.[43] As such, every such claim is inaccurate on its face because it states that the in-person services the defendant provided occurred in the recipient's home in Connecticut, although the defendant was in Texas at the time. Even if this could somehow be explained as an error, the fact remains that, for all of those 114 claims to have reflected in-person meetings the defendant had, in Texas, with someone other than the designated service recipient, as part of that recipient's individualized care plan, as the defendant suggests, the court, despite having expressly credited Bruni's testimony, would have had to infer that the other providers or supporters for all service recipients themselves were in Texas on the date or dates of service as well. Such an inference would not have been reasonable based on

---

[43] On July 1, 2, 5 and 6, 2018, alone, the defendant submitted thirty-five claims for a total of forty-nine hours of face-to-face consultations with, or with someone on behalf of, fifteen different clients.

sheer numbers alone. Moreover, the court would have had to infer that *all* 114 encounters somehow occurred at the recipients' homes while the defendant and providers or supporters were rendering services together in Texas, which is equally unreasonable.[44] See, e.g., *State v. Abraham*, 343 Conn. 470, 478, 274 A.3d 849 (2022) ("[i]t is an abiding principle of jurisprudence that common sense does not take flight when one enters a courtroom" (internal quotation marks omitted)). Finally, as previously stated, the nature of the services the defendant and the recipients' other providers and supporters were offering were supposed to be home and community based. It simply is not reasonable or logical to conclude that they could, or would, be offering these types of services from Texas, on 114 separate occasions, particularly when in-person, face-to-face meetings without the service recipient present are "highly unusual." Instead, the reasonable and logical view of the evidence presented supports the court's finding that at least some of the face-to-face services for which payment was sought and obtained were not performed at all, and thus the defendant was properly convicted of health insurance fraud.

The judgment is affirmed.

In this opinion the other judges concurred.

————————————————

[44] Indeed, as previously noted, to sustain its burden of proving health insurance fraud, the state simply had to prove, and the court had to find, that only one of the 114 claims for face-to-face services rendered from Dallas, Texas, was fraudulent. See footnote 41 of this opinion. To acquit the defendant, however, the court would have had to find that all of the 114 claims were legitimate.